*244 OPINION OF THE COURT
Gabrielli, J.
On the morning of August 24, 1975, the defendant shot and killed his brother-in-law, Joseph Foti, by firing five shotgun blasts at him, two of which proved to be fatal. There was no apparent motive for the killing; in fact, the evidence indicated that the victim and defendant had enjoyed a very close and warm relationship over the years. Following a protracted trial, defendant was convicted of having committed murder in the second degree (Penal Law, § 125.25, subd 1) by shooting his brother-in-law with a sawed-off shotgun. At his jury trial, defendant acknowledged having committed the acts charged in the indictment, but contended that his conduct should be excused because he was legally insane at the time of the alleged crime and, consequently, could not be held criminally responsible for his actions (see Penal Law, § 30.05). The People, in an effort to rebut this claim, sought to establish that the shooting was merely a product of defendant’s "explosive personality”, a character trait not rising to the level of legal insanity. To this end, the District Attorney offered proof through the testimony of witnesses that defendant had committed a number of unprovoked, violent acts, unconnected with his brother-in-law, prior to the shooting. It is the trial court’s ruling permitting the use of all of this testimony that forms the basis of the present controversy.
The People’s direct case at trial consisted solely of testimony by several police officers, each of whom described the circumstances surrounding the shooting. Lieutenant Fusco, a criminologist, explained that the dwelling in which the shooting occurred was divided into two apartments which were separated by a staircase and a doorway. Defendant and his wife occupied the upper apartment, while the defendant’s in-laws occupied the floor below. On the basis of information derived from the autopsy and from the position of the bullet holes in the woodwork, Lieutenant Fusco was able to conclude that the victim, Joseph Foti, had been standing on the lower landing of the staircase leading to defendant’s apartment when he was struck by gun discharges fired from above. After the first shot was fired, according to Lieutenant Fusco, the victim had enough strength to exit the building through the lower apartment in a vain attempt to effect an escape via the driveway. It was at this point, Lieutenant Fusco stated, that Foti was struck by the fatal shots, which were fired from a *245 second-floor patio connected to defendant’s apartment. Defendant was apprehended shortly after the shooting and promptly acknowledged his responsibility for his brother-in-law’s death.
Following the close of the People’s direct case, defendant called a number of lay and expert witnesses in an effort to demonstrate that the shooting was the product of a "paranoid delusion” which caused him to believe that his brother-in-law was trying to kill him and that immediate defensive action was necessary to ward off an imminent attack. Several acquaintances of defendant were called to attest to the fact that defendant appeared distracted and unusually tense in the days immediately preceding the shooting. Defendant’s sister and several other relatives confirmed these observations and further noted that defendant’s attack on his brother-in-law was particularly uncharacteristic, since the two men had always enjoyed a very close and warm relationship. Nola Santarelli, defendant’s wife, testified that in the weeks preceding the killing, her husband had become increasingly disturbed as a result of efforts by members of the FBI to convince him to become a witness in a criminal action on the government’s behalf. Defendant had been especially unnerved, according to Mrs. Santarelli, when his close friend, Vincent Christina, also tried to persuade him to become a witness for the government.
Testimony concerning the events of the day of the shooting was supplied by Mrs. Santarelli, defendant’s father and the victim’s widow. All three testified that on the morning of the day in question, defendant had had a violent argument with his wife in which he accused her of working with the FBI. Mrs. Santarelli fled from the couple’s apartment as a result of the quarrel, and defendant’s brother-in-law, Joseph Foti, was called in to act as a peacemaker. Defendant immediately indicated his desire not to speak with Foti, but Foti persisted in pursuing the conversation. Finally, when Foti attempted to follow defendant into the latter’s apartment, defendant opened his apartment door and fired upon his brother-in-law.
To support his contention that his acts had been the product of a "paranoid delusion”, defendant also called to the stand two expert witnesses who were familiar with his background. On direct examination, both psychiatrists stated their professional beliefs that defendant had been in a psychotic state aggravated by amphetamine abuse when he shot his brother- *246 in-law and that, at the time of the crime, he lacked substantial capacity to apprehend the nature and consequences of his acts or that, his conduct was wrong (see Penal Law, § 30.05). Upon cross-examination of defendant’s expert witnesses, however, the District Attorney attempted to establish that defendant’s conduct also could be explained as a symptom of a "personality disorder” commonly termed an "explosive personality”. He elicited through questioning that an individual suffering from such a disorder would probably have a history of violent, antisocial conduct and would have a tendency to react with disproportionate violence in the face of relatively mild provocation. Moreover, the psychiatrists stated, although an individual with a "personality disorder” will often exhibit poor impulse control, especially when placed under stress, such an individual is generally considered to be in touch with reality and cannot be classified as legally insane within the meaning of section 30.05 of the Penal Law.
Having thus established the medical and legal significance of the term "explosive personality”, the prosecutor then attempted to demonstrate that defendant was suffering from that condition rather than from the more serious condition of "delusional psychosis” and that, consequently, his conduct in shooting his brother-in-law could not be legally excused. By using the technique of hypothetical questioning, the District Attorney initially elicited from the expert witnesses that the shooting could be considered symptomatic of an "explosive personality” if it were assumed that the actor had committed certain specific acts of violence in the past and it were further assumed that he was laboring under considerable emotional stress at the time of the crime. The prosecutor then offered to prove through witnesses that defendant had, in fact, committed a number of irrational, violent acts in his past and that his tendency to react with violence had been exacerbated by the pressure that was being placed upon him in the weeks preceding the shooting as a result of his involvement with organized crime.
Defense counsel promptly objected to the admission of such proof on the ground that it would be highly prejudicial and would be probative only of defendant’s propensity to commit violent crimes. Arguing that the evidence was not relevant to any material element of the People’s case, defendant took the position that it should be excluded under the standards articulated in People v Goldstein (295 NY 61) and People v Moli *247 neux (168 NY 264). The trial court, however, rejected defense counsel’s argument and permitted the prosecutor to proceed with his rebuttal witnesses, while granting defendant a "continuing objection”. Santarelli ultimately was convicted of murder in the second degree, and his conviction was affirmed by the Appellate Division. Noting that the challenged evidence "carried little potential for prejudice in this case”, the Appellate Division upheld the trial court’s ruling on the basis of what it perceived to be a "general rule” that once a defendant asserts the insanity defense, "any and all prior conduct of the accused having a bearing on the subject is admissible, even though it might also tend to show him guilty of other crimes” (64 AD2d 803, 804).
We note at the outset that we agree in principle with the Appellate Division’s conclusion that the People are entitled to introduce evidence of prior criminal conduct which is probative of the defendant’s sanity once the question of the defendant’s sanity is made an issue in the case. We nonetheless hold that the present conviction must be reversed, since we find that much of the evidence admitted by the Trial Judge failed to meet the test of "relevancy” long established in our earlier decisions.
 As a general rule, evidence of prior, uncharged criminal conduct may not be admitted as part of the People’s direct case if its only purpose is to establish the accused’s propensity to engage in criminal activities (e.g., People v Fiore, 34 NY2d 81, 84; People v Dales, 309 NY 97, 101; Coleman v People, 55 NY 81, 90; see Richardson, Evidence [10th ed — Prince], § 170; Wigmore, Evidence [3d ed], § 305). While such evidence may be marginally relevant to the question of the accused’s guilt, its probative value is deemed to be outweighed by its potential for prejudice, and, accordingly, the evidence is excluded as a matter of judicial policy (People v Molineux, 168 NY 264, 294, supra; see People v Allweiss, 48 NY2d 40, 46; People v Zaekowitz, 254 NY 192; Fisch, New York Evidence [2d ed], § 209; McCormick, Evidence [2d ed], § 190). On the other hand and in limited instances, where the evidence of prior, uncharged criminal conduct has a bearing upon a material aspect of the People’s case other than the accused’s general propensity toward criminality, our cases have recognized that the probative value of the evidence justifies its admission, notwithstanding the potential for incidental prejudice (People v Allweiss, 48 NY2d 40, supra; People v Vails, 43 NY2d 364; People *248 v Jackson, 39 NY2d 64; People v Molineux, 168 NY 264, supra).
There is no pre-established formula for determining when a particular uncharged criminal or immoral act may be admitted in evidence against a defendant (see McCormick, Evidence [2d ed], § 190). Although we have suggested certain "categories” for use as a guide in evaluating the relevance of such evidence (see People v Molineux, 168 NY 264, supra), we have consistently stated that these categories are not exhaustive, but rather represent "illustrations” of the type of analysis to be applied in cases involving potentially prejudicial information (e.g., People v Vails, 43 NY2d 364, 368, supra; People v Jackson, 39 NY2d 64, 68, supra; People v Calvano, 30 NY2d 199, 205-206). We have held, for example, that evidence of prior, uncharged crimes will often be admissible in cases where the defendant raises the affirmative defense of entrapment (People v Calvano, 30 NY2d 199, supra; see People v Mann, 31 NY2d 253). This is so because, in asserting this defense, the accused necessarily places his predisposition to commit the crime in issue (see Penal Law, § 40.05) and thereby "opens the door” for the People to introduce evidence of similar uncharged acts. Similarly, when a defendant interposes the "insanity defense”, he necessarily puts in issue some aspects of his character and personal history. By coming forward with sufficient evidence to rebut the presumption of sanity, the defendant in effect injects a new factual issue into the case, and the People are consequently required to bear the additional burden of proving the defendant sane beyond a reasonable doubt (see, e.g., People v Silver, 33 NY2d 475). It would strain the rules of evidence beyond anything ever intended by our prior decisions to hold, as defendant urges, that the People are precluded from introducing evidence to counter a defendant’s claim of insanity solely because the evidence involves the defendant’s previous immoral or unlawful conduct.
We hold instead that evidence of uncharged criminal or immoral conduct may be admitted as part of the People’s case on rebuttal if it has a tendency to disprove the defendant’s claim that he was legally insane at the time of the crime. Background information which sheds light upon a defendant’s personal history is often of crucial significance in cases involving the insanity defense, and we decline to adopt a blanket rule which would exclude such information solely because it is *249 indicative of the defendant’s prior antisocial conduct. Having placed his mental state before the trier of fact, the defendant cannot complain when the People seek to bring forth additional evidence bearing upon that issue.[1]
This is not to suggest, however, that a defendant automatically places his entire character in issue when he interposes the defense of legal insanity. To the contrary, a defendant who asserts an insanity defense "opens the door” to the People’s "character evidence” only to the extent that such evidence has a natural tendency to disprove his specific claim. In the present case, for example, defendant’s claim was that he suffered from a form of "temporary insanity” that prevented him from apprehending the nature and consequences of his acts and from knowing that his conduct was wrong. He attempted to establish this claim through lay testimony concerning his "unusual” behavior in the weeks preceding the shooting and through expert testimony indicating that his symptoms were consistent with an ultimate "break with reality” in the form of a "paranoid delusion”. The presumption of sanity having thus been rebutted, the People were faced with the burden of having to prove defendant sane beyond a reasonable doubt. Given the nature of defendant’s insanity claim, it was reasonable for the prosecutor to counter defendant’s evidence with evidence that defendant’s conduct also was consistent with a "personality disorder” not rising to the level of legal insanity. To the extent that evidence of defendant’s prior violent acts and his relationship with organized crime had a direct bearing upon the validity of the People’s "explosive personality” theory, we think it was clearly admissible.
The problem arises in this case, however, because the Trial Judge failed to evaluate with sufficient particularity whether each piece of evidence offered by the People was actually relevant and material to their "explosive personality” theory (cf. People v Allweiss, 48 NY2d 40, 49, supra).[2] It is on this *250 point, in fact, that we depart from the views expressed by the Appellate Division. In deciding whether to admit evidence of prior criminal or immoral conduct in rebuttal to an insanity claim, the trial court must take special care to ensure not only that the evidence bears some articulable relation to the issue, but also that its probative value in fact warrants its admission despite the potential for prejudice. As we noted in People v Allweiss (48 NY2d 40, 47, supra): "If the evidence is actually of slight value when compared to the possible prejudice to the accused, it should not be admitted, even though it might technically relate to some fact to be proven” (accord McCormick, Evidence, § 190). This observation is particularly apt in cases involving the insanity defense, where virtually every fact in the accused’s life may in some sense be said to have a bearing upon the issue of his mental state.[3] Indeed, in insanity cases such as this, the danger is particularly great that the jury will become confused by the mass of evidence presented and will decide to convict the defendant not because they find he was legally sane at the time of the act, but rather because they are convinced that he is a person of general criminal bent.
With these considerations in mind, we turn our attention to an analysis of the individual pieces of evidence that were admitted below over objection by defense counsel. The first witness to testify for the People on rebuttal was one Robert Grover, who stated that he had observed defendant participate in a barroom scuffle. Grover, however, had no information regarding how the fight started and was unable to state *251 whether defendant had reacted without adequate provocation. Thus, while Grover’s testimony may have served to demonstrate that defendant actually did engage in violence on at least one occasion, it could not logically be used to support the People’s theory that defendant had a chronically “explosive” temperment or a "hair trigger” temper. Since there was at least some potential for prejudice in Grover’s testimony, and since the testimony was not directly relevant to the question of defendant’s sanity, we think that it should have been excluded.
Similarly objectionable was the admission of testimony by a police officer, Charles Monroney, who stated that he observed defendant standing behind a bar throwing bottles and glasses around the room. Like the testimony offered by Robert Grover, Officer Monroney’s testimony shed no light on the questions of how the incident began and whether there might be some rational explanation for defendant’s conduct. In light of the ambiguity of this testimony, it cannot be said that its probative value with respect to defendant’s mental condition outweighed its potentially prejudicial effect, and accordingly, we find that the testimony should not have been placed before the jury.
The most serious trial error occurred, however, when the Trial Judge permitted the jury to hear the testimony of Vincent Christina, defendant’s close friend, and one Eugene Heath, a teamster shop steward. Heath stated under oath that he had been attacked and badly beaten by two men, but he was unable to identify his assailants. Christina supplied the missing information, testifying that he and his friend, Joseph Santarelli, had traveled to Heath’s place of business and had beaten the shop steward in accordance with a pre-established plan. The admission of this testimony plainly posed a danger that the jury would be influenced by the implication that defendant was a vicious individual who was given to coldblooded acts of violence. Yet, there was nothing in the testimony that was indicative of an "explosive personality” or a penchant for impulsive violence; if anything, the contrary was suggested. Since there could have been no logical purpose for the evidence concerning the Heath incident other than to demonstrate defendant’s general propensity toward criminality, there was no justification for the admission of this highly prejudicial information.
Finally, we hold that it was also error to permit testimony *252 by defendant’s probation officer, John Caram, that defendant had previously been convicted of possession of a sawed-off shotgun. We can see no logical relationship between the ownership of a weapon, legal or not, and the symptoms of an "explosive personality”, and we therefore conclude that whatever probative value the evidence may have had was greatly outweighed by its potential for prejudicing the jury.
It should be noted that not all of the evidence offered by the People to support their "explosive personality” hypothesis suffered from the same infirmity. Probation Officer Caram, for example, also testified concerning several incidents in which defendant had resorted to violence in the face of relatively mild provocation. Since Officer Caram was able to give some information about the precipitating events preceding these incidents, this testimony was directly relevant to the question of defendant’s reaction patterns. Thus, it was properly admitted despite the danger of prejudice.
Similarly, the testimony elicited by the prosecutor regarding defendant’s relationship to organized crime had a tendency to support the People’s trial theory and was therefore properly admitted in evidence. An important aspect of the People’s case on rebuttal was its contention that defendant was not suffering from "paranoid delusions”, but rather was under considerable emotional stress at the time of the shooting as a result of circumstances that were firmly rooted in reality. It was shown that defendant had been made aware that an attempt had been made on the life of his friend, Vincent Christina, and that this knowledge had caused him to be fearful enough for his own safety to make inquiries concerning the possibility of receiving FBI protection. Although the connections were not drawn definitively, there was a clear implication that defendant’s fears were based upon his familiarity with local organized crime activities. The prosecutor’s purpose in bringing out these facts was to demonstrate that defendant was under very real stress at the time of the shooting. As indicated by the testimony of the expert witnesses, such a stressful situation would likely accentuate the characteristics of an individual with an "explosive” personality and cause him to react with disproportionate force when faced with frustration or mild provocation. Hence, if the facts concerning defendant’s problems with respect to organized crime were proven, the jury could infer that the shooting had simply been precipitated by the considerable emotional pressure under which *253 defendant had been laboring, rather than by any "temporary psychosis” sufficient to satisfy the definition of legal insanity. For this reason, we conclude that the testimony offered by the People to demonstrate that defendant was familiar with organized crime activities and had become fearful for his life was relevant, to the central issue in this case, the defendant’s sanity. Accordingly, the testimony was properly admitted in evidence.
We note in passing that we are not insensitive to the problems encountered by the Trial Judge in cases such as this. It is often difficult, if not impossible, for the Trial Judge to determine in advance whether the testimony of a particular witness will be relevant to a specific issue in the case. Here, the Trial Judge made a commendable effort in this direction by conducting an inquiry out of the jury’s hearing to ascertain the nature and relevance of the People’s rebuttal proof. It is apparent from our holding, however, that his inquiry was not sufficiently detailed to permit him to make an informed determination as to the relevance of each piece of evidence offered by the District Attorney. Indeed, in view of the unpredictability of live testimony, we note that it is sometimes almost impossible for a Trial Judge to ascertain in advance whether the evidence offered through a witness regarding a defendant’s past crimes would be sufficiently relevant to justify its admission at trial.
It is for this reason that we disapprove of defense counsel’s decision in this case to rely upon a "continuing objection” to the District Attorney’s entire line of proof. While defense counsel’s anticipatory "continuing objection” may have served the technical function of preserving a "question of law” for appellate review (see CPL 470.05, subd 2), it did not provide the Trial Judge with an opportunity to consider the specific relevance of each fact as it was being presented through testimony. Had individual objection been taken each time prejudicial information was elicited, the Trial Judge might have been moved to require the prosecutor to articulate his theory of relevancy with more specificity, and the defects in the instant proceeding might have been avoided (cf. People v Michael, 48 NY2d 1, 6). In light of the difficulties encountered in this case, we find that the trial court’s acceptance of defendant’s "continuing objection” was ill-advised and that the interests of all parties would have been better served had individual objection been required.
*254 Finally, we note that the Trial Judge acted properly in instructing the jury that it could consider defendant’s prior criminal history only in relation to the question of his sanity and not as an indication of his general propensity to commit the crime for which he was on trial. While such limiting instructions could not serve to cure the errors in admitting the objectionable testimony, they did serve the salutory purpose of minimizing any prejudicial effect that the otherwise properly admitted evidence might have had on the minds of the jurors.
For the foregoing reasons, the order of the Appellate Division should be reversed and the case remitted for further proceedings on the indictment.

. We note that other jurisdictions have recognized that a defendant’s prior immoral or criminal acts may have probative value when the question of the defendant’s sanity is made an issue in the case (e.g., People v Valcalda, 188 Cal 366; Mears v State, 83 Nev 3, cert den 389 US 888).

. This is not to suggest, of course, that the prosecution was limited to building a single, integrated theory of "sanity” as a means of rebutting defendant’s insanity claim. To the contrary, the prosecutor was free to present his rebuttal case in any manner he deemed most effective. Here, the prosecutor chose to concentrate on establishing an alternate theory of defendant’s mental state to demonstrate that the *250 shooting was the act of a legally sane man. Since the prosecutor himself elected to chart his own course in this manner and, indeed, relied exclusively upon his "explosive personality” hypothesis as a justification for introducing evidence of defendant’s prior immoral and illegal acts, his offer of proof can only be evaluated with reference to that hypothesis.

. It is true that in People v Carlin (194 NY 448, 452), we stated that "[t]he whole previous career of a man, in its general aspects at least, may throw some light on his mental condition at the time when he is alleged to have committed a criminal offense, and when insanity is relied on as a defense”. This statement, however, was intended only as an indication of the considerable latitude which should be afforded to a defendant who is seeking to prove his own insanity as a defense to a criminal charge. The statement certainly was not intended to suggest that the People may bring in "the whole previous career of a man” whenever the insanity defense is interposed. Indeed, such a rule would impose an unwarranted burden upon a defendant who has a potential defense on grounds of insanity, since it would force him to choose between foregoing the defense on the one hand and, raising it on the other hand and taking the risk that the People will use the occasion to place all of his past immoral or illegal conduct before the jury, regardless of its relevance.