■ The People of the State of New York, Respondent, v Rafael Sanabria, Appellant. [56 NYS3d 284]—

Judgment, Supreme Court, New York County (Bonnie G. Wittner, J.), rendered November 1, 2013, convicting defendant, after a jury trial, of robbery in the first degree, and sentencing him, as a second violent felony offender, to a term of 10 years, affirmed.

In 2011, defendant followed the victim, who did not recognize defendant, into a building and demanded money. Defendant pulled out a kitchen knife about seven inches long, stated he would not hurt her, and told her to give him $12. The victim handed him a $20 bill, which prompted defendant to ask for another, and she complied. Defendant ran out of the building and ended up at a Duane Reade store. The victim told a bystander what occurred, and several bystanders found defendant in the Duane Reade and waited for him to exit. As defendant exited and attempted to flee, several bystanders tackled him. Defendant was held down by two men, and one bystander saw a small kitchen steak knife on the ground. When two po-

lice officers arrived, they stood up defendant and transported him to the stationhouse. During processing, the officers recovered two packs of cigarettes from defendant, and he told an officer that he robbed a woman with a knife because he needed cigarettes.

During trial, defendant raised a defense of lack of criminal responsibility by mental disease or defect. Defendant's expert, Dr. Eric Goldsmith, reviewed documents, including the criminal complaint, indictment, voluntary disclosure form, and defendant's medical records. In addition, Dr. Goldsmith interviewed defendant several times and interviewed his family members. Dr. Goldsmith opined that defendant was experiencing schizophrenic conditions, including loud voices that told him he should do what he needed to get cigarettes, and that defendant believed something bad would happen if he did not follow the voice's command. Specifically, Dr. Goldsmith opined that defendant could not determine whether what he actually did was wrong or against commonly held moral principles. Dr. Goldsmith's conclusions were largely based on self-reporting by defendant, such as defendant stating that he had used a butter knife during the robbery, he only asked for $20, and he walked away after taking the money. Dr. Goldsmith also concluded that a violent act was uncharacteristic of defendant because defendant had stated he had no history of violence.

The People's expert, Dr. Jason Hershberger, reviewed the complaint, the knife, defendant's medical records, and Dr. Goldsmith's report. He interviewed defendant and conducted a mental status exam, and concluded that at the time of the robbery, defendant did not suffer from any delusions and that his memory was fine. Dr. Hershberger noted that medical records from just after the arrest showed defendant was not suffering from delusions or hearing any voices, which was unusual because in his expert opinion, delusions do not come and go that fast. Dr. Hershberger stated that it strained medical believability that defendant would experience such intense and controlling delusions, but not suffer from any psychotic delusions 10 days before or 2 days after the robbery. Dr. Hershberger also stated that defendant's account attempted to minimize the crime and evade responsibility. Moreover, Dr. Hershberger contended that defendant knew his actions were wrong, because defendant "hid the weapon under his clothes" as he was walking, revealing it only after he was alone with the victim, and that he ran away afterwards.

The court properly exercised its discretion in admitting evidence that defendant had been released from prison a few

months before the robbery, and denying counsel's request to redact that information from defendant's medical records. In support of the defense of lack of criminal responsibility by reason of mental disease or defect, the defense psychiatric expert testified that defendant had been stable throughout his years in custody, when he received proper treatment for his schizophrenia. However, after he was released, he no longer received treatment, he became unstable, he began hearing voices, and he committed the robbery a few months later. Evidence of defendant's confinement in prison was "inextricably interwoven" with the expert's testimony and conclusion (*People v Ventimiglia*, 52 NY2d 350, 361 [1981]). The court minimized the possible prejudice by excluding evidence of defendant's underlying conviction and only admitted references to his imprisonment.

The court properly rejected defendant's suggested use of terms such as "institution" or "facility," rather than "prison," because such terms might have confused the jury, or led it to speculate on the circumstances surrounding his confinement. Moreover, the court instructed the jury that the evidence was admitted solely for the purpose of evaluating the expert's opinion. Thus, the probative value of the evidence outweighed any prejudicial effect, which was avoided by the court's thorough limiting instructions (*see generally People v Bradley*, 20 NY3d 128, 133 [2012]).

The dissent claims that the trial court infringed on defendant's ability to present a defense when the court prevented defendant's expert from expanding on his answers provided during cross-examination about defendant's prior violent act. Defendant did not preserve his claim regarding the alleged limitations on his expert's testimony, and we decline to review it in the interest of justice. As an alternative holding, we find no basis for reversal.

At trial, the People asked Dr. Goldsmith if he was aware that defendant had committed a serious violent crime in his past. Dr. Goldsmith answered that he was aware defendant was "convicted of a serious violent act, which was later overturned on appeal, which he later then took a plea to, an *Alford* plea." The People asked to strike the answer, requesting Dr. Goldsmith answer with a yes or no to the question. After defense counsel's objection, the court stated the People's question stands, and that Dr. Goldsmith's previous answer would be stricken. Further, the court informed the jury that the ques

tion was being asked not for the truth of the statement, but whether or not it would have influenced the doctor's conclusion if he knew of certain facts. In response to the question, Dr. Goldsmith stated, "I don't know." The People then asked that if he was aware that defendant had put a pillow over a woman's face and choked her, whether "that would be a violent act, right?" Dr. Goldsmith answered it "would be a violent act." Dr. Goldsmith then stated that he was aware there was an allegation that defendant had committed a violent crime in the past. The People asked, "[I]t's fair to say then that when the defendant tells you he has absolutely no violence in his past that's not a completely accurate statement, correct?," to which Dr. Goldsmith responded, "[I]ncorrect."[1] Dr. Goldsmith then answered that it was still his opinion that this robbery was out of character for defendant.

The dissent states that because the court struck Dr. Goldsmith's answer and instructed him to answer in a "yes or no or I don't know" capacity, the court infringed on counsel's ability to present a defense. The doctor's reference to an *Alford* plea went beyond the People's question. Further, defense counsel failed to revisit this issue on redirect by exploring the basis of Dr. Goldsmith's response that his opinion was unchanged.[2] In any event, Dr. Goldsmith did not change his conclusion, and ultimately his answer was "I don't know," which required no further explanation.

Moreover, the court gave curative instructions as to why these questions were being asked, and repeatedly instructed the jury during this exchange that the questions were only to determine whether the doctor's conclusion would have been influenced based on these facts. Finally, during the jury charge, the court again explained that the information that defendant was in a institution or was in prison was not introduced to show the jury that he committed this particular crime or that he has a propensity to commit crimes, but was submitted only for the jury to assess the basis of the experts' opinions and the accuracy of information the experts relied upon. Even if the court had allowed Dr. Goldsmith to discuss the *Alford* plea in his answer, there is no reason to assume that would change the verdict.

---

**1.** While the dissent states Dr. Goldsmith "was not allowed to explain his reasons for doubting that defendant had committed those acts" after answering "incorrect," the record shows that right afterwards, Dr. Goldsmith actually answered several questions uninterrupted.

**2.** We note there may have been a good reason why counsel did not pursue this on redirect, because it might have had involved the jury in the collateral issue of why someone takes an *Alford* plea.

Many of the facts that Dr. Goldsmith relied on were refuted by evidence in the record, which showed defendant was not being truthful. Thus, there was an ample basis in the record for the jury to reject Dr. Goldsmith's conclusion. For example, defendant reported to Dr. Goldsmith that he had walked away after the robbery, but witnesses saw defendant run away. Defendant also misinformed Dr. Goldsmith that he asked for $20, when in reality he had asked for exactly $12. Further, defendant told Dr. Goldsmith he had used a butter knife in the robbery, but Dr. Goldsmith discovered from other sources that defendant had used a serrated steak knife to threaten the victim.

Defendant has not made a CPL 440.10 motion, and his ineffectiveness claim cannot be resolved based on the current record on appeal (*see generally People v Rivera*, 71 NY2d 705, 709 [1988]). In the alternative, to the extent the record permits review, we conclude that defendant received effective assistance of counsel (*see People v Benevento*, 91 NY2d 708, 713-714 [1998]; *Strickland v Washington*, 466 US 668 [1984]). Defendant has not shown that any of counsel's alleged deficiencies fell below an objective standard of reasonableness, or that, viewed individually or collectively, they deprived defendant of a fair trial or affected the outcome.

The only issue at trial was whether defendant proved his affirmative defense under Penal Law § 40.15 by establishing that he did not appreciate the wrongfulness of the robbery he committed. Defendant has not shown that any of counsel's alleged errors and omissions had any effect on the jury's decision to credit the People's expert witness, who effectively rebutted the defense's expert's conclusions.

We reject the dissent's claim that counsel's question during voir dire about defendant having a criminal case involving a "sexual incident" could not have been a strategic decision. Raising the issue during voir dire may have had several possible strategic purposes, as explained by the court to the panel. Specifically, immediately after counsel's question, the court noted that counsel was "bringing it up, defense counsel, because it may come out. So he wants to make sure that—he's not conceding that [defendant] did or didn't do anything, but his background, this defendant's whole life may come up again about things he did or didn't do in his life in your evaluation of the psychiatric evaluation." Without an expanded record, which requires a 440.10 motion, we cannot say there was no objective

reasonable strategy in probing the jurors about their personal beliefs on this issue (*see generally Benevento* at 712).[3]

Counsel himself raised the strategic value earlier to the court. Specifically, after the court had explained that the defense expert could be questioned about a prior violent act without using the word "rape," counsel explained that he had a concern about the ruling. Counsel stated that voir dire would be critical here, and that during voir dire he wanted to find out how much it could affect the jurors to learn about the felony conviction for rape.

Defense counsel's reference to a sexual incident was only made during voir dire, and was not admitted into evidence at any point during trial. Moreover, immediately after counsel's use of the words "sexual incident," the court interjected and gave a curative instruction to the panel. The court explained that defendant may or may not have a prior record, that it would not be evidence of defendant's guilt here, and that the jurors may learn certain information about defendant's background being admissible only to the extent that it effects each psychiatrist's opinion. The court reminded the panel that an event from defendant's past was not evidence of the instant crime, was not admissible, and that the jurors "may consider that in evaluating the reliability of the expert's opinion" that defendant did not know the consequences of his actions. As the court immediately clarified counsel's statements and assured the prospective jurors that this was only a hypothetical situation, any possible prejudice was cured.

Pursuant to the court's ruling, defense counsel redacted references to defendant's prior sexual assault conviction from his medical records. Although, counsel attempted to redact these references, he did not completely obscure or darken the underlying text in all the exhibits. His failure to foresee that the underlying text could be read in certain light angles does not provide a basis to reverse on ineffective assistance grounds. Only some of the exhibits containing these redactions were requested and published to the jury. Of the exhibits published to the jury, it is speculative to conclude that the jury read the redacted information, and the obscured text did not contain the underlying details of defendant's prior violent act. In light of the above, counsel's failure to completely obscure the text did not change the jury's verdict nor deprive defendant of meaningful representation (*see Benevento* at 714 ["whether defendant would have been acquitted of the charges but for counsel's errors is relevant, but not dispositive"]).

---

**3.** In fact, later during voir dire, a juror did volunteer that he or she had "zero tolerance" as to sexual misconduct.

With regard to defendant's remaining ineffectiveness claims, we likewise find that the present, unexpanded record fails to show defendant received ineffective assistance of counsel under either the state or federal standards.

The court properly exercised its discretion in refusing to conduct any inquiry into whether a highly publicized mass murder committed by a mentally ill man during defendant's trial affected the jurors' ability to continue serving. Other than the fact that both crimes involved a mentally ill man, there was no resemblance between the two cases, and no reason to make an inquiry (see *People v Moore*, 42 NY2d 421, 433-434 [1977], *cert denied* 434 US 987 [1977]; *People v Figueroa*, 4 AD3d 118, 119 [1st Dept 2004], *lv denied* 2 NY3d 799 [2004]; *see also People v Shulman*, 6 NY3d 1, 32 [2005], *cert denied* 547 US 1043 [2006]). Concur—Richter, Gische and Webber, JJ.

Acosta, P.J., and Manzanet-Daniels, J., dissent in a memorandum by Manzanet-Daniels, J., as follows: The trial court infringed on defendant's ability to present a defense when it allowed the prosecutor to question defendant's psychiatric expert about the graphic particulars of defendant's prior rape conviction (which was subsequently vacated on appeal), yet prevented him from explaining why he had doubts that defendant had committed that crime. Moreover, defendant was deprived of the effective assistance of counsel by defense counsel's references to the conviction during voir dire and the submission of inadequately redacted exhibits that served as a reminder of the lurid details of the prior crime, despite the trial court's pretrial ruling precluding that evidence. I would accordingly reverse defendant's conviction for robbery in the first degree, and remand for a new trial.

Defendant suffers from schizophrenia. He has auditory and visual hallucinations as well as paranoid delusions. Over the 30 years since his diagnosis, defendant has been in various psychiatric hospitals and other institutionalized settings and on and off medication.

In 2011, defendant was charged with robbery in the first degree for forcibly stealing property with a dangerous instrument. Prior to trial, defense counsel moved to exclude evidence of defendant's 2005 conviction for rape in the first degree. The conviction was reversed by this Court upon a finding that the trial court had erred in precluding the defense from investigating the complainant's prior claims of molestation by her doctors, which, if proven to be false, could have been used to undermine her veracity and account of what had transpired (72 AD3d 552 [1st Dept 2010], *lv denied* 15 NY3d 756 [2010]).

After the reversal, defendant entered an *Alford* plea in exchange for a sentence resulting in his near immediate release.

The prosecution argued that it ought to be allowed to question the defense's psychiatric expert about the prior conviction because Dr. Goldsmith based his opinion, in part, on the aberrational nature of defendant's threat of violence during the robbery. Defense counsel noted that the conviction had been reversed, and that defendant had subsequently entered an *Alford* plea.

The trial court agreed that the evidence of the prior rape would be unduly prejudicial. Nonetheless, the trial court ruled that the prosecution could ask Dr. Goldsmith whether the fact that defendant had committed a prior violent act would affect his opinion concerning defendant's criminal responsibility. While prohibiting any evidence that the crime involved rape or sexual assault, the court permitted the prosecution to elicit the underlying facts of the crime, namely, that defendant had allegedly put a pillow over a woman's face and strangled her.

When defense counsel tried to object, the trial court silenced him, stating, "Excuse me. They were proven beyond a reasonable doubt and the verdict is overturned only because of something Justice Goodman did. He chose to plead guilty in an *Alford* plea." Defense counsel registered an objection.

The court found that questioning about the rape would be unduly prejudicial, but stated that the defense expert could be cross-examined concerning the basis of his opinion that defendant was nonviolent. The court suggested that the prosecutor "come up with some language about a violent act without mentioning rape," while acknowledging, "I don't know how you could do that."

At trial, the defense called Dr. Goldsmith as a witness. Dr. Goldsmith testified that defendant was a paranoid schizophrenic who suffered from both auditory and visual hallucinations. Defendant was diagnosed at the age of 25 and had been hospitalized multiple times beginning in the 1980s. Dr. Goldsmith opined that defendant had been fairly stable while receiving treatment, but noted that when he relocated back to New York City, he was unable to re-enroll at St. Luke's/Roosevelt, and wasn't receiving therapy. He began drinking again, worsening his delusional state. It was in this paranoid and hallucinatory state of mind that defendant committed the robbery.

During cross, the prosecutor asked Dr. Goldsmith, "[B]y now you're aware the defendant had committed a serious violent

crime in the past, correct?" Defense counsel's objection to the question was overruled. Dr. Goldsmith answered that he was aware defendant had been "convicted of a serious violent act," but noted that the conviction had been overturned on appeal and that defendant had subsequently entered an *Alford* plea. The prosecution posed the question again, and defense counsel again objected, following which a sidebar was held.

When proceedings resumed, the trial court instructed the jury that the question stood but that Dr. Goldsmith's answer was stricken and that the jury was to disregard it.

The prosecution posed the question again to the defense expert. Before Dr. Goldsmith could answer, the court intructed the witness, "[T]hat's a 'yes' or 'no.'" Upon defense counsel's objection, the court clarified that Dr. Goldsmith could respond "yes," "no," or "I don't know." Dr. Goldsmith replied, "I don't know," whereupon the prosecution demanded, "And if you were aware that the defendant put a pillow over a woman's face and choked her that would be a violent act, right?" Defense counsel's objection was overruled, and Dr. Goldsmith answered, "[T]hat would be a violent act." The prosecution asked whether Dr. Goldsmith was aware that there was an allegation that defendant had committed a violent crime in the past, to which the expert replied, "Correct." The prosecution then asked, "And it's fair to say that when the defendant tells you he has absolutely no violence in his past that's not a completely accurate statement, correct?" Dr. Goldsmith replied, "[I]ncorrect," but was not allowed to explain his reasons for doubting that defendant had committed those acts.

I would reverse the conviction and remand for a new trial. The court infringed on counsel's ability to present a defense by allowing the prosecution to question defendant's expert about certain aspects of defendant's prior rape conviction, yet preventing Dr. Goldsmith from explaining why he had doubts defendant had committed the crime.

Dr. Goldsmith testified that defendant's prior conviction did not alter his opinion concerning defendant's state of mind at the time of the crime. The prosecution aggressively cross-examined Dr. Goldsmith concerning this point, asking, "And it's fair to say then that when the defendant tells you he has absolutely no violence in his past that's not a completely accurate statement, correct?" Any attempt to explain that defendant had entered an *Alford* plea and had not in fact admitted the elements of the prior crime was rebuffed by the trial court. Indeed, the trial court struck Dr. Goldsmith's explanation concerning why the prior conviction had not altered his opinion

and instructed the jury to disregard his response. Later, in summation, the prosecution argued that the jury should not believe Dr. Goldsmith because he refused to acknowledge defendant's prior rape conviction. The prosecutor asserted that "[e]verything he premised his opinion on . . . crumbles when scrutinized even slightly," noting that none of his expertise could explain "how he completely sticks to that conclusion in the face of the facts being markedly different from what he believes them to be when he initially made that conclusion."

Defendant's expert was precluded from explaining why he doubted that defendant had committed the prior rape. The rape conviction was not overturned simply "because of something Judge Goodman did," as the trial court asserted. The complainant in the rape case, a patient at a mental health treatment center, had made claims of sexual abuse against several of her doctors. The trial court precluded the defense from investigating the details of those prior claims, despite the fact that they were relevant to her credibility. After the conviction was overturned, defendant was offered a plea that would result in his immediate release from prison. Ultimately, he entered an *Alford* plea in exchange for a sentence of time served.

By failing to allow Dr. Goldsmith to explain the circumstances surrounding the prior conviction, the trial court gave the jury a "distorted impression" of the facts (*People v Carroll*, 95 NY2d 375, 386 [2000]), namely, that Dr. Goldsmith had simply ignored the conviction in arriving at his opinions. It prevented defendant from rebutting the prosecutions's claim that Dr. Goldsmith lacked credibility or that defendant had lied to his expert, depriving defendant of his due process right to present a defense (*see People v Hudy*, 73 NY2d 40, 56-58 [1988] [defendant denied due process where the trial court prevented him from presenting evidence challenging the credibility of the complainant], *abrogated on other grounds by Carmell v Texas*, 529 US 513 [2000]).

The majority attempts to minimize the impact of the trial court's ruling restricting Dr. Goldsmith's testimony, asserting that Dr. Goldsmith's references to an *Alford* plea "went beyond the People's question." It cannot seriously be denied that by disallowing a reference to the plea, and limiting the expert to "yes," "no," or an "I don't know" answer, the trial court effectively deprived the doctor of any effective means of rebutting the prosecutor's assertion that defendant had a serious violent history, as well as thoroughly undermined the expert's credibility.

The court's restriction on Dr. Goldsmith's testimony pre-

vented defendant from being able to rebut the prosecution's attack on the credibility of the expert upon whom defendant's entire defense rested and skewed the trial in the People's favor.

I would also find that defendant was deprived of the effective assistance of counsel when his attorney during voir dire told the jury that defendant had been convicted of a sexual assault and submitted inadequately redacted exhibits containing references to the details of the rape and defendant's conviction. The claim is properly raised on direct appeal, since defendant has met his burden of establishing the absence of a legitimate explanation or discernible strategy for counsel's actions (*see People v Jarvis*, 25 NY3d 968 [2015]; *People v Cleophus*, 81 AD3d 844 [2d Dept 2011]).*

To demonstrate ineffective assistance of counsel under the federal standard, a defendant must show that but for counsel's error, "there is a reasonable probability that . . . the result of the proceeding would have been different" (*Strickland v Washington*, 466 US 668, 694 [1984]). The prejudice component under the state standard of meaningful representation "focuses on the fairness of the process as a whole," requiring reversal "whenever a defendant is deprived of a fair trial" (*People v Caban*, 5 NY3d 143, 156 [2005] [internal quotation marks omitted]).

Almost immediately after beginning voir dire, counsel told the panel of jurors that they would hear that defendant had a prior criminal case for a "sexual incident." The jury learned the details of the prior conviction for sexual assault when defense counsel failed to properly redact the exhibits.

Defense counsel introduced highly prejudicial evidence without any strategic or legitimate explanation for doing so (*see e.g. People v Stefanovich*, 136 AD3d 1375, 1378 [4th Dept 2016] [reversing conviction where defense counsel referred to prior sexual offense during voir dire, perceiving no "discernible benefit" to defense counsel's strategy, concluding he took "an inexplicably prejudicial course of action by allowing the jury to know the defendant (wa)s a registered sex offender" (internal quotation marks omitted)], *lv denied* 27 NY3d 1139 [2016]; *People v Jarvis*, 113 AD3d 1058, 1059-1060 [4th Dept 2014] [no strategic explanation for defense attorney's failure to object to the introduction of prejudicial and previously excluded evidence that the defendant had threatened a prosecution witness], *affd* 25 NY3d 968 [2015]; *People v Cleophus*, 81 AD3d at

---

* It should be noted that co-counsel made a motion for a mistrial on these grounds, affording defense counsel the opportunity to explain his strategy.

846 ["no valid tactical reason" for defense counsel's failure to object to the admission of the minutes of defendant's prior guilty plea when such evidence was statutorily excludable]). The evidence of the prior rape conviction had already been excluded by the trial court so there was no danger of the prosecutor introducing or relying on the rape conviction. Indeed, had the prosecution done so, defendant would have had grounds for a mistrial. An argument that the door would have inevitably opened by virtue of other trial evidence is speculative at best.

The evidence of defendant's prior rape conviction was highly prejudicial given the nature and severity of the crime. The jury learned not only that defendant had a rape conviction, but that he had been sentenced to 21 years on account of the violent crime. The inadequate redactions provided graphic reminders of defendant's criminal past, including references to "serving a twenty-one year sentence for violent sexual crimes," and "forc-[ing] the [victim] to have sexual intercourse with him." That this evidence was highly prejudicial is patent from the fact that the court determined initially to exclude it.

Defendant has shown that "counsel's representation fell below an objective standard of reasonableness" and that as a result thereof he was deprived of a fair trial (*see People v Caban*, 5 NY3d at 155-156; *People v Garcia*, 19 AD3d 17, 20 [2005]). I would accordingly reverse the conviction and remand for a new trial.