[982 NE2d 570, 958 NYS2d 650]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DALE BRADLEY, Appellant.

Argued October 17, 2012; decided November 20, 2012

**POINTS OF COUNSEL**

*Timothy P. Donaher, Public Defender*, Rochester (*Kimberly F. Duguay* of counsel), for appellant. I. Evidence that Dale Bradley stabbed an unknown man under unknown circumstances at an unknown time was irrelevant to whether Dale Bradley stabbed Joseph Wilburn in self-defense and, given that the potential for

unfair prejudice resulting from the admission of the evidence significantly outweighed any probative value, it was an abuse of the trial court's discretion to determine that the evidence was admissible at trial. (*People v Molineux*, 168 NY 264; *People v Williams*, 56 NY2d 236; *People v Gillyard*, 13 NY3d 351; *Coleman v People*, 55 NY 81; *People v Rojas*, 97 NY2d 32; *People v Alvino*, 71 NY2d 233; *People v Hudy*, 73 NY2d 40; *People v Concepcion*, 17 NY3d 192; *People v Wesley*, 76 NY2d 555; *People v Cass*, 18 NY3d 553.) II. The trial court committed reversible error when it refused to instruct the jury that it could consider evidence of post-traumatic stress disorder that was introduced by both the prosecution and the defense without objection because defense counsel's notice of intent to present psychiatric evidence only mentioned battered woman syndrome. (*People v Concepcion*, 17 NY3d 192; *People v Diaz*, 15 NY3d 40; *People v Berk*, 88 NY2d 257; *People v Petty*, 7 NY3d 277; *People v Davis*, 58 NY2d 1102; *People v Young*, 65 NY2d 103; *People v Goetz*, 68 NY2d 96; *People v Wesley*, 76 NY2d 555.)

*Sandra Doorley, District Attorney*, Rochester (*Leslie E. Swift* of counsel), for respondent. I. The Fourth Department's affirmance should stand because the contested *Molineux* ruling was proper as the prior stabbing was interjected into the case by defendant and thus was properly employed during the People's direct case as it was relevant and probative to the issues under the jury's consideration. (*People v Ventimiglia*, 52 NY2d 350; *People v Beam*, 57 NY2d 241; *People v Allweiss*, 48 NY2d 40; *People v Calvano*, 30 NY2d 199; *People v Alvino*, 71 NY2d 233; *People v McManus*, 67 NY2d 541; *People v Vails*, 43 NY2d 364; *People v Rojas*, 97 NY2d 32; *People v Cass*, 18 NY3d 553.) II. Defendant was precluded from obtaining a justification charge referencing post-traumatic stress disorder due to her noncompliance with the CPL, and defendant's self-defense claim was not unduly compromised as correctly found by the Fourth Department. (*People v Diaz*, 15 NY3d 40; *People v Hill*, 4 NY3d 876; *People v Almonor*, 93 NY2d 571; *People v Berk*, 88 NY2d 257; *People v Segal*, 54 NY2d 58; *People v Umali*, 37 AD3d 164, 10 NY3d 417; *People v Petty*, 7 NY3d 277; *People v Jones*, 3 NY3d 491; *People v Bolling*, 7 NY3d 874.)

#### OPINION OF THE COURT

Chief Judge LIPPMAN.

Defendant stands convicted of manslaughter in the first degree. In a statement given shortly after the homicide, and at

trial, defendant admitted fatally stabbing her estranged boyfriend, Joseph Wilburn, but claimed that she had done so while attempting to defend herself. Mr. Wilburn, she said, appeared at her home early on the morning of February 2, 2007. Although she had an order of protection against him, she allowed him in and an argument ensued. She asked him to leave but he refused, and when she tried to call the police, he choked her and then came at her with a snow shovel, threatening to "bust [her] head open." According to defendant, as Wilburn swung the shovel at her, she grabbed a knife and, with her eyes closed, lunged at him, hitting him once in the chest. After attempting without success to stanch the bleeding from Wilburn's wound, defendant called 911 for emergency assistance and then panicked and ran from her house. She was eventually approached on the street near her house by one of the police officers responding to the homicide scene. He testified that when she was pointed out to him by a concerned pedestrian she was shivering, disheveled and apparently disoriented. Marks observed on defendant's neck soon after she was taken by the police to the Monroe County Public Safety Building for questioning seemed to confirm that she had been recently choked, and a snow shovel with a plastic blade was found at the homicide scene near the victim's left hand.

The trial evidence showed, and there is no dispute, that the 45-year-old defendant had been a frequent victim of sexual and other physical abuse since her early childhood. In connection, then, with her claim that she had swung the knife at Wilburn in self-defense, she urged, and presented expert testimony to show, that her perception of and response to Wilburn on the occasion of their final altercation was significantly and reasonably influenced by post-traumatic stress disorder (PTSD) and, somewhat more specifically, battered woman syndrome (BWS).

To rebut defendant's claim of justification and her related contention that her understanding of and reaction to the situation resulting in the homicide had been eventuated by the psychiatric sequelae of her victimization, the prosecution presented its own psychiatric expert and, in a pretrial *Molineux* application, sought as well to introduce evidence of six uncharged incidents in which defendant reportedly resorted or threatened to resort to violence against men. Evidence as to two of these incidents was allowed in the People's direct case over defendant's opposition: the People were permitted to elicit testimony from the victim's brother, Quinton, that the day before the homicide he heard defendant call out that she would stab Joseph

if he did not close the door to her house, which he had left open while he and his brother conversed; and the People were permitted to elicit from a social worker testimony that defendant, during a therapy session with her some 10 years before the Wilburn homicide, confessed that she had at some unspecified, necessarily more remote time stabbed an unidentified man in the thigh.

At trial, the social worker, who had no independent recollection of her professional interaction with defendant, testified from her notes that defendant had reported that "she stabbed a gentleman who had been [harassing] her, in the thigh," and that she had in the course of her treatment stated that she was "very angry toward men" for all the abuse she had suffered.

In summation, the prosecutor argued that the fatal Wilburn stabbing had, like the stabbings[1] by defendant predating it, been motivated by anger and not by a reasonably perceived need to resort to deadly force for self-protection. The court charged the jury that in assessing whether defendant reasonably believed that the use of deadly force was necessary to protect herself, it could take into account the evidence that defendant suffered from BWS.[2]

Defendant's principal appellate contention has been that the social worker's testimony as to defendant's disclosure of the thigh stabbing should not have been received. That evidence, defendant has maintained, was not reliably probative of her state of mind on the occasion of the Wilburn stabbing more than a decade later, and introduced an unacceptable risk that defendant would be convicted on the basis of a perceived propensity on her part to knife merely bothersome men.

The Appellate Division addressed the *Molineux* issue only to the extent of rejecting defendant's argument that the trial court did not engage in the required exercise of discretion (*see People v Alvino*, 71 NY2d 233, 242 [1987]) to weigh the probative worth of the prior bad act evidence against its potential for undue prejudice; it found that, although not memorialized on the record, the proper exercise of discretion was implicit (83 AD3d 1444, 1445 [4th Dept 2011]). The Court did not address whether

---

**1.** In addition to the thigh stabbing, reference was made during the trial testimony to another stabbing of Wilburn by defendant (in which she cut his cheek) some six years before the homicide.

**2.** The trial court's refusal to charge PTSD as well is argued by defendant as a ground for reversal, but inasmuch as we grant defendant relief on a sufficient alternative ground we do not reach that issue.

there was, in the first instance, a proper theory of relevance to support the introduction of the testimony respecting the thigh stabbing; it said, evidently inaccurately, that defendant had not argued the point.

A Judge of this Court granted defendant permission to appeal (18 NY3d 857 [2011]) and we now reverse and direct a new trial.

We have for some time recognized the broad principle that when there is an issue raised as to whether a defendant acted culpably it may be appropriate to permit the prosecution to respond by adducing evidence of uncharged conduct tending to show that the defendant possessed the mens rea necessary to guilt. In *People v Santarelli* (49 NY2d 241 [1980]), for example, we held that "evidence of uncharged criminal or immoral conduct may be admitted as part of the People's case on rebuttal if it has a tendency to disprove the defendant's claim that he was legally insane at the time of the crime" (*id.* at 248) and, recently, in *People v Cass* (18 NY3d 553 [2012]), we held proof of an uncharged prior homicide admissible to rebut a claim of extreme emotional disturbance. But, the receipt of evidence of uncharged bad acts, even when offered to prove a subjective element, is not exempt from the general prohibition against evidence actually probative only of criminal propensity. To be admissible, such evidence must be demonstrably relevant to the specific state of mind issue in the case and it must be found, on balance, more probative than prejudicial (*see Santarelli*, 49 NY2d at 249-250).

Applying these principles in *Santarelli*, we reversed a conviction resting upon evidence of prior uncharged behavior adduced to show that the defendant was not, as he claimed, temporarily insane at the time of the charged homicide, but merely given to explosive outbursts. We reasoned that the prior episodes upon which the People relied were presented without context and so could not be reliably characterized as probative precedent behavior (*id.* at 250-251). By contrast, in *Cass*, we held that detailed evidence of a prior homicide by the defendant had been shown relevant to rebut a claim of extreme emotional disturbance made with respect to the charged subsequent, very similarly targeted and committed homicide (*Cass*, 18 NY3d at 563); taken together, the two relatively closely spaced homicides tended to show premeditation incompatible with the defendant's mitigating claim of extreme emotional disturbance (*id.*). In so holding, however, we reiterated that "evidence of bad acts

must have some 'logical relationship' to, and a 'direct bearing upon,' the People's effort to disprove [a state of mind defense]," and that an assertion of a state of mind defense "opens the door to bad acts evidence 'only to the extent that such evidence has a natural tendency to disprove [a defendant's] specific claim' " (*id.* at 562-563, quoting *Santarelli*, 49 NY2d at 249, 252). We also stressed, yet again, the obligation of trial courts to "take special care to ensure not only that the evidence bears some articulable relation to the issue, but also that its probative value in fact warrants its admission despite the potential for prejudice" (*id.* at 563, quoting *Santarelli*, 49 NY2d at 250 [internal quotation marks omitted]).

■ As the present case proceeded to trial it was clear that the undisputed facts raised an issue as to whether defendant had been justified in her resort to deadly force. There was, after all, objective evidence to support defendant's claim that she had been choked by Wilburn and that Wilburn, the subject of an outstanding order of protection, then came after her with a shovel. There would, it appeared, also be evidence of defendant's personal history and knowledge of Wilburn relevant to the reasonableness of her claimed perception of imperilment (*see People v Wesley*, 76 NY2d 555, 559-560 [1990]). To meet their burden to disprove the defense of justification (Penal Law §§ 35.15, 25.00 [1]), the People would have to demonstrate that defendant did not actually believe that she was in mortal danger, or failing that, that her belief was not reasonable (*Wesley*, 76 NY2d at 559). While we do not think the trial court erred in permitting the People in the *Molineux* context to introduce on their direct case some evidence anticipatory of the elaborate justification claim defendant would imminently advance, any such evidence had to possess "a natural tendency to disprove [defendant's] specific claim" as to her state of mind (*Santarelli*, 49 NY2d at 249). The proffered evidence of the thigh stabbing did not, in our view, have such probative value.

Defendant's specific relevant claim was that at the time she swung her knife at Wilburn she reasonably believed that he was about to seriously harm her. That claim, premised in essential part on the particular objective circumstances attending the altercation and defendant's knowledge of Wilburn, was not in any direct or logical way disproved by proof of the bare circumstance that defendant at some remote, indeterminate time had stabbed an unidentified man in the thigh. While that stabbing assertedly was in response to harassment, the nature

of the harassment was left entirely to the imagination. It is possible that the harassment was relatively minor, but it is at least equally possible that it was not. If defendant during the earlier incident used her knife to ward off a sexual or other serious assault, it would not logically show that her subsequent conduct was, as the prosecution contended, simply an expression of unbridled rage.

Given her history, defendant might very well have been angry at men, but anger and fear for one's personal safety are not mutually exclusive, and defendant's mere harboring of anger did not with any degree of reliability exclude the entirely plausible hypothesis that her use of force, in either the prior uncharged or the subsequent charged stabbing, had been justified. The absence of any context to shed light on the actual motivation for the thigh stabbing left the jury to speculate both as to the nature of defendant's conduct on the occasion of that earlier stabbing and as to its possible relevance to the characterization of her conduct more than 10 years later when she plunged her knife into Wilburn's chest. Without some better developed theory of relevance the two incidents were resonant solely for what they seemed to disclose about defendant's violent propensity and the manner of its expression; the testimony as to the thigh stabbing did not in any reasonably disciplined way tend to disprove defendant's claim that she had used the knife against Wilburn to defend herself from what she reasonably believed would be grievous personal harm.

Although the trial court did instruct the jury that the evidence of the earlier stabbing was not to be considered as evidence of criminal propensity, but only as it bore upon "the reasonableness of the defendant's conduct with respect to the defense of justification and the defense claim that she suffers from battered wife [sic] syndrome," given the ill-defined, indeed, on this record, purely speculative relevant relation between the two stabbings, this instruction would not, as a practical matter, have avoided the forbidden inference of propensity naturally set in motion by the incidents' superficial similarity.

We do not minimize the strength of the prosecution's case. The jury could quite reasonably have concluded that defendant was not particularly fearful of Wilburn, whom she had admitted to her home despite the order of protection barring him from being there, and that her evidently forceful knife thrust to the middle of Wilburn's chest was not justified by Wilburn's attack

with a plastic-bladed snow shovel.[3] There was, in addition, significant evidence, not now challenged, suggesting that defendant's use of knives against Wilburn was not confined to situations in which she was immediately imperiled, and that her relationship with Wilburn was mutually abusive. Nonetheless, given the extensive evidence of Wilburn's abusive behavior, defendant's lifelong history of victimization and PTSD diagnosis, and the objective corroboration of those portions of defendant's narrative in which she stated that just prior to the fatal stabbing Wilburn choked her and then attacked her with a snow shovel, we do not think it possible to conclude that there would have been no significant probability of a different verdict if the disputed *Molineux* evidence had not been received. The jury's understanding of this case could well have turned even on a small element of the People's proof, and defendant's admission to the prior stabbing, particularly as recounted by her former therapist in tandem with her non-contemporaneous but, as elicited, apparently motivationally relevant statements respecting her general, free floating anger towards men, were potentially extremely prejudicial.

Accordingly, the order of the Appellate Division should be reversed and a new trial ordered.

SMITH, J. (dissenting). I dissent because it seems only fair to me that, in a case where defendant essentially presented her autobiography as her defense, the People should be allowed to introduce a bit of her history that casts her in a less favorable light.

Defendant told the jury a truly horrifying story of the treatment she received in the home of an aunt who had raised her until she was almost 12 years old. She said: "I was treated horribly. I was sexually abused. I was beaten with extension cords. I was put in hot . . . tubs of water . . . at six." She added that her male cousins sodomized and raped her and her sister, as well as "bullying us and beating us up." Her uncle, she said, also sexually abused her. Asked when the sexual abuse started, she replied: "I was around the age of two or three." The description of defendant's childhood continues in painful detail for several pages of transcript.

---

**3.** Although the lethality of the shovel was a matter for the jury, it is fair to point out, as defendant does, that the shovel weighed only four tenths of an ounce less than Babe Ruth's bat, one of the heaviest ever used in the major leagues.

The People, as the majority points out, did not dispute this testimony; it is not obvious how they could have obtained evidence disproving it, even if it was not true. Nor did the People challenge its relevance, and I agree that it was relevant to the issue before the jury—which was whether defendant was justified in killing a man when she was 45 years old. Defendant was entitled to argue to the jury that the child abuse, though it preceded the killing by decades, caused her to perceive as life-threatening the physical abuse that she suffered at the hands of the man she killed. His violent acts toward her, bad as they were, might not seem to many so extreme as to justify a homicide; the plastic shovel he attacked her with weighed 2.6 pounds. (Though that is only a little lighter than Babe Ruth's baseball bat [*see* majority op at 136 n 3], a jury could find that it was less compact and much less likely to cause fatal injury.) The story of defendant's early life was admissible to show that she could reasonably be more fearful than most.

But I do not see why, in fairness, the People—who obviously had much less access than defendant herself to the details of her life's story—could not introduce in rebuttal a few details that they were able to glean, to support an inference that her dreadful experiences had instilled in her more rage than fear. That she had once told a therapist that she had stabbed a man who was "harassing" her in the thigh, and that she was "very angry toward men" was surely admissible for this purpose. It is true, as the majority says, that this evidence does not *compel* the inference that the People ask the jury to draw—just as defendant's evidence did not compel the inference that her killing of her attacker was justified. But the evaluation of the competing inferences was properly left to the jury.

The majority speculates that perhaps defendant's previous stabbing of a man was itself justified; perhaps she "used her knife to ward off a sexual or other serious assault" (majority op at 135). Perhaps; and perhaps defendant was exaggerating, or even fabricating, the abuse she suffered in childhood. These sorts of questions are for the jury, and defendant had a substantial advantage over the People in presenting evidence for the jury to consider. If the prior stabbing was indeed self-defense, nothing stopped her from saying so. The unconventional order of proof in this case—where, apparently with defendant's implicit consent, the People essentially presented their rebuttal case before she testified—augmented defendant's advantage, for she was able on her own case to rebut the rebuttal, if she had evidence to rebut it with.

The whole idea of excluding "propensity" evidence, to my mind, loses its meaning in a case like this where defendant offers a justification defense that is based in large part on the claim that she had a propensity, instilled in early childhood, to fear violence. If the jury can consider that propensity, why not another one? The majority relies on *People v Santarelli* (49 NY2d 241 [1980]), in which we held certain propensity evidence inadmissible to rebut an insanity defense. But the insanity defense in *Santarelli* was not, fundamentally, a propensity defense, as the justification defense here in large part is.

Judge Jasen, dissenting in *Santarelli*, suggested that the rule excluding propensity evidence—the rule of *People v Molineux* (168 NY 264 [1901])—should have little application in cases where there is no dispute as to "whether the defendant actually committed the acts complained of" (49 NY2d at 255). I find Judge Jasen's dissent persuasive. But there is no need to overrule *Santarelli* to decide this case. We need only hold that, where a defendant offers evidence of her own propensities, the People are entitled to present a contrary version.

Judges CIPARICK, GRAFFEO, READ and PIGOTT concur with Chief Judge LIPPMAN; Judge SMITH dissents in a separate opinion.

Order reversed and a new trial ordered.