# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 62
The People &c.,
      Respondent,
    v.
Sebastian Telfair,
      Appellant.

Barry Krinsky, Esq., for appellant.
Jean M. Joyce, for respondent.
Hon. Letitia James, New York State Attorney General, intervenor.

HALLIGAN, J.:

Defendant Sebastian Telfair challenges his conviction of criminal possession of a weapon in the second degree (*see* Penal Law § 265.03 [3]) on several grounds. First, he raises facial and as-applied challenges to the statute under which he was convicted based

on the U.S. Supreme Court's recent decision in *New York State Rifle & Pistol Assn., Inc. v Bruen*, 142 S Ct 2111 (2022). Those arguments are unpreserved and, for the reasons set forth in *People v Cabrera* (decided today), we do not reach them. Second, Telfair argues that the trial court deprived him of his right to a fair trial in admitting evidence of alleged prior bad acts under *People v Molineux*, 168 NY 264 (1901) and allowing the prosecutor to make propensity arguments during summation. Because we conclude Supreme Court erred in permitting admission of the prior bad acts evidence and the error was not harmless, we reverse.

Telfair was arrested on an early morning in June 2017. After he made a U-turn without his headlights on, law enforcement officials pulled Telfair over. As the officers approached Telfair's truck, they smelled marijuana and observed a lit marijuana cigarette on the center console. The officers seized the cigarette, arrested Telfair and his passenger, and transported them and the vehicle to the police precinct.

During an inventory search, the police recovered various items, including two small bags of marijuana and cash. They also found a loaded .45 caliber gun in the truck's center console, as well as three handguns and ammunition in the flatbed area; each firearm was legally purchased and registered in Telfair's name in Florida. The defendant was charged with several crimes related to possession of weapons and ammunition, as well as various vehicle and traffic violations.

The People moved under *People v Molineux*, 168 NY 264 (1901) to introduce evidence of two prior incidents involving Telfair's possession of a weapon: a 2006 uncharged crime and a 2007 misdemeanor conviction for weapon possession. The People

expected that Telfair would claim at trial that someone else had packed his truck and unbeknownst to him, placed his guns inside it, and the prior acts would show the defendant actually knew he possessed the firearms on the day of his arrest. Defense counsel responded that given the temporal remoteness and dissimilarity of the prior incidents, they had "little, if any, probative value" and were highly prejudicial, in part because the 2007 conviction concerned the same charge for which Telfair was now on trial. When asked whether he would assert that Telfair did not know the guns were in his car, defense counsel did not disclaim the defense.

Supreme Court admitted the evidence, finding it "extremely probative" that in the prior incidents Telfair "claimed not to have knowledge of guns found in his possession" and "came up with an excuse about not having placed those guns in his possession, whether it's his luggage or his vehicle." The court noted it would provide a limiting instruction that the evidence should be considered only as to Telfair's knowing state of mind and absence of mistake, not any propensity to commit the alleged crime. At various points during the trial, the court gave such an instruction, including during the People's opening and closing statements, multiple times throughout the testimony regarding the incidents, as part of the jury charge, and in response to a jury question during deliberations.

Opening statements and much of the trial testimony focused on whether Telfair knew the guns were in his car. Telfair's wife testified that he had moved out of their Florida home, taking his belongings and storing them with the help of Caterina Scotto, his girlfriend at the time. Scotto testified to the same course of events and that she allowed the defendant to store his cars at her home, opened storage units for him, and helped him

coordinate the shipping of two vehicles (including the truck in which he was stopped) to New York after movers packed them. She also claimed to have seen the defendant put a gun in the bed of the truck before it was shipped. A tow truck driver testified to taking the defendant's two vehicles and passing them along to a vehicle transporter, who in turn testified to taking the vehicles to New York and leaving them with Telfair. The People also demonstrated that the guns were legally purchased by and registered to Telfair in Florida, and that one of the guns was found in the truck's center console after the arrest. And a detective testified to New York Police Department records showing that the City's license plate reader system placed the defendant's truck at numerous locations across New York in the days after it arrived there, but before the defendant's arrest.

Defense counsel told the jury that Telfair did not know the guns were in his car; that Telfair had someone else pack the truck and did not know the guns were placed inside it; and that when Telfair retrieved the truck from a long-term packing facility the day before his arrest, he still did not know the guns were inside it. Defense counsel further contended that the absence of Telfair's fingerprints or DNA on the guns confirmed his account.

The People put on *Molineux* evidence regarding the two prior incidents in which the defendant previously possessed guns outside of Florida. First, a Massachusetts detective testified that in 2006, while Telfair was a professional basketball player, a flight attendant on the team plane found a .22 caliber pistol in a pillow imprinted with a photograph of Telfair's baby. The detective determined that the gun was legally owned by the defendant's then-girlfriend, Samantha Rodriguez. Telfair told the detective at the time that he had borrowed Rodriguez's gym bag while packing for his trip and did not realize it contained

the pistol; not knowing what to do with the gun once he discovered it after boarding, he placed it inside his pillow. The detective testified that, after inspecting the gym bag and confirming that it contained Rodriguez's belongings, he accepted the defendant's explanation and no criminal charges were filed.

Next, a police officer and an assistant district attorney testified regarding the 2007 incident, in which Telfair was stopped for speeding in Westchester County and the officer found a loaded .45 caliber handgun under the passenger seat. According to the assistant district attorney, Telfair's lawyer proffered that the gun belonged to Rodriguez, and that, as the primary user of the vehicle, she must have left the gun in the car. Telfair and his fiancé pleaded guilty to criminal possession of a weapon in the fourth degree.

In summation, the prosecutor referenced the guns found in the prior incidents, stating that the "defendant claimed I didn't know, I had them by accident," and "now here we are again ten years later in 2017 he's caught again and it's the same excuse." Telfair objected, and the court reiterated its limiting instruction, but the prosecutor then remarked that the jury could consider that "[Telfair's] used this, I don't want to say excuse, but he's used this defense multiple times."

During deliberations, the jury sent a note requesting clarity on how the *Molineux* evidence could be used, which read: "How is the jury allowed to use the evidence from the Westchester and Boston firearm incident for and not allowed to use it for, eg, knowledge or lack of mistake as to what?" Defense argued that a responsive instruction should not refer to mistake or accident because the defense theory was not that Telfair had mistakenly possessed guns, but rather that he did not know he possessed them. The court nonetheless

reiterated its instruction, and the jury returned a guilty verdict shortly thereafter. Telfair was convicted of one count of criminal possession of a weapon in the second degree in connection with the gun recovered from the truck's center console and acquitted of all other charges.

The Appellate Division affirmed, concluding that Supreme Court properly exercised its discretion in admitting the *Molineux* evidence because it was relevant and probative of Telfair's knowing possession of the guns; that Telfair had placed the element in issue by claiming a lack of knowledge; and that any potential prejudice was offset by the multiple limiting instructions. Justice Barros dissented and granted the defendant's application for leave to appeal to this Court and for a stay of execution of the judgment, which we extended pending determination of this appeal.

Before this Court, Telfair raises several constitutional challenges to his conviction for the first time. He argues that the U.S. Supreme Court's decision in *New York State Rifle & Pistol Assn., Inc. v Bruen*, 142 S Ct 2111 (2022) rendered unconstitutional the entirety of New York's licensing regime, which in turn meant that the provision under which he was convicted for unlicensed possession was facially unconstitutional. Telfair also contends that the statute is unconstitutional as applied to him on several grounds: that given his valid Florida gun license, we must assume that the proper cause requirement alone made his unlicensed possession criminal, and that his right to travel under the Privileges and Immunities Clause is violated by what the defendant construes as a residency requirement for New York licenses. These arguments are unpreserved and, for the reasons set forth in *People v Cabrera* (decided today), we do not reach them.

Turning to Telfair's *Molineux* claim, the general rule is that evidence of a defendant's prior uncharged crimes or bad acts is inadmissible in a criminal trial (*see Molineux*, 168 NY at 291-292). "The natural and inevitable tendency of the tribunal -- whether judge or jury -- is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge" (*People v Zackowitz*, 254 NY 192, 198 [1930] [Cardozo, J.]). Excluding such evidence avoids the risk of infecting jury deliberations with forbidden propensity inferences (*see Molineux*, 168 NY at 291-293; *People v Ventimiglia*, 52 NY2d 350, 359 [1981]).

There are, however, exceptions to this rule: Evidence of prior crimes may be admissible "if it helps to establish some element of the crime under consideration or is relevant because of some recognized exception to the general rule" (*People v Alvino*, 71 NY2d 233, 241 [1987]). In *Molineux*, we set out several such exceptions: motive, intent, absence of mistake or accident, common scheme or plan, or identity of the defendant (*see Molineux*, 168 NY at 293).

In reviewing a *Molineux* ruling, we must first assess whether the People have "identif[ied] some issue, *other than mere criminal propensity*, to which the evidence is relevant" (*People v Hudy*, 73 NY2d 40, 55 [1988]). That is a question of law, not discretion, for this Court's review (*see People v Cass*, 18 NY3d 553, 560 n 3 [2012]; *Alvino*, 71 NY2d at 242). If the evidence is relevant to some issue other than propensity, we consider whether the probative value of the evidence "outweighs its potential for prejudice" (*People v Ely*, 68 NY2d 520, 538 [1986], quoting *Ventimiglia*, 52 NY2d at 359).

"[T]he trial court's decision to admit the evidence may not be disturbed simply because a contrary determination could have been made or would have been reasonable. Rather, it must constitute an abuse of discretion as a matter of law" (*People v Morris*, 21 NY3d 588, 597 [2013], citing *Cass*, 18 NY3d at 560 n 3). If the Court concludes that *Molineux* evidence was erroneously admitted, harmless error analysis determines whether a new trial is warranted (*see People v Frankline*, 27 NY3d 1113, 1115 [2016]).

The threshold question, then, is whether the prior incident evidence was relevant to an issue other than propensity. We conclude it was not.

The key question at trial was knowledge: whether Telfair knew that the guns were in his truck. That focus was clear at a pretrial hearing, in defense counsel's opening statement and on summation, and in an exchange with the court following the jury's question on the significance of the *Molineux* evidence. While the dissent insists there is no meaningful difference between knowledge and mistake here (dissenting op at 4), the distinction seems plain: For example, one might know an item had been in a car but mistakenly think it had been removed, as opposed to having no knowledge it had ever been there in the first place. Precedent bears that out; *Molineux* and its progeny distinguish between "mistake or accident" and "intent or guilty knowledge" (*Molineux*, 168 NY at 297-305; *Cass*, 18 NY3d at 560). But our disagreement with the dissent on the nature of the defense is not dispositive of the outcome here. Whether labelled as knowledge or mistake, the evidence regarding the 2006 and 2007 incidents did not increase the possibility that Telfair knew there were guns in his car in June 2017.

*Molineux* and later cases rest on the proposition that in circumstances where "intent is not to be inferred from the commission of the act," "proof of intent is often unobtainable except by evidence of successive repetitions of the act" *(Molineux*, 168 NY at 297-298). For example, in a case alleging check forgery, evidence that "at or near the same time the defendant had passed, or had in his possession, similar forged instruments" would be relevant to prove intent, and the same is true for allegations of "passing counterfeit money," "receiving stolen property and obtaining money under false pretenses" (*id*.).  In these instances, the admission of prior bad acts evidence is "founded on the law of probabilities" (*People v Ingram*, 71 NY2d 474, 479 [1988]), as the dissent notes, or a theory of warning (*id.* at 482 [Kaye, J., concurring]).[1]

Evidence of the 2006 and 2007 incidents was not relevant to whether Telfair knew that the guns in question were in his vehicle in 2017.  The warning theory has no application here; that Telfair unknowingly possessed other guns in two completely different circumstances about 10 years prior could not have put him on notice that there might have been guns in his truck this time.  As for the law of probabilities, the dissent (echoing the prosecutor's summation), argues that "defendant's history of repeatedly transporting firearms outside the jurisdictions in which they were licensed, as well as the similarity of his excuses when caught" refute his defense here (dissenting op at 6).  But in *Ingram*, on which the dissent relies, the Court emphasized the factual similarity and temporal

---

[1] Contrary to the dissent's suggestion (dissenting op at 8 n 5), nothing in our opinion narrows admissible *Molineux* evidence to one of these categories or the other.

proximity of the later robbery to the one at issue in concluding that the evidence was properly admitted to cast doubt on the defendant's claim of innocence (*Ingram*, 71 NY2d at 480).

In other cases where this Court has permitted *Molineux* evidence to prove a subjective element of a crime, or to rebut a defendant's defense as to that element, the prior acts were likewise proximate in time and quite similar to the alleged crime (*see e.g. Alvino*, 71 NY2d at 243 [evidence of recent, repeated, and highly similar uncharged crimes admissible]; *People v Caban*, 14 NY3d 369, 375 [2010] [license suspension resulting from defendant's traffic incident three months prior properly admitted to prove mens rea where the license "was suspended for conduct frighteningly similar . . . –backing unsafely into a crosswalk"]; *People v Bradley*, 20 NY3d 128, 133 [2012] ["evidence of a prior homicide . . . relevant to rebut a claim of extreme emotional disturbance made with respect to (a subsequent homicide)" where the homicides were "very similarly targeted and committed" and "relatively closely spaced"], citing *Cass*, 18 NY3d at 563-564 [evidence admissible where homicides occurred in similar circumstances and 14 months apart]).

Not so here. The 2006 and 2007 incidents were neither very similar nor close in time to the 2017 incident. Just the opposite: they involved different guns, different sets of circumstances, different excuses, and occurred more than 10 years earlier. In that key respect, this case resembles *People v Bradley*, 20 NY3d 128 (2012), where we reiterated the general principle that evidence of prior incidents may be admissible to prove a "subjective element" such as state of mind, but held that conduct similar only in broad respects and occurring at a "remote, indeterminate time" would disclose only the

"defendant's violent propensity and the manner of its expression" and was thus not sufficiently relevant to be admissible (20 NY3d at 133-135).  Likewise, the prior gun possession incidents here are essentially evidence of prior wrongdoing that "tended to show only that 'if defendant did it once . . . he would do it again' " (*People v Vargas*, 88 NY2d 856, 858 [1996]; *Alvino*, 71 NY2d at 242 [same]; *People v Katz*, 209 NY 311, 328 [1913] ["proof showing that A. shot B. at one time and place throws no light upon the charge that A. poisoned C. at another time and place"]; *Hudy*, 73 NY2d at 56 ["(This) is precisely th(e) type of result that the *Molineux* rule was adopted to prevent"]). [2]

The dissent's assertion that today's ruling "destabilizes our century-old *Molineux* jurisprudence" is puzzling, to say the least (dissenting op at 16).  Our disagreement turns on whether this particular *Molineux* evidence is relevant to an issue other than defendant's propensity to possess guns.  If anything, it is the dissent's view that would upset our precedent.  Neither the People nor the dissent have identified any New York appellate decision upholding reliance upon a defendant's prior possession of a gun to show subsequent knowing possession of a different gun, let alone doing so where the circumstances of the prior incident are so remote and distinct from those of the charged incident.  The case cited by the Appellate Division below allowed testimony that the defendant knowingly possessed a gun in his residence two years earlier to prove his knowing possession of *the same gun* within *the same residence* (*People v Lawrence*, 141

---

[2] Our conclusion rests on the totality of facts presented in this case, not any "bright-line rule of exclusion" based on the age of the prior incidents (dissenting op at 10).

AD3d 1079, 1080-1081 [4th Dept 2016]; *see also People v Kidd*, 112 AD3d 994, 995 [3d

Dept 2013] [testimony that defendant had purchased and used or displayed the same gun

relevant to defendant's knowing possession of that same gun four years later]). Rather, the

Appellate Division has held that evidence of prior possession of a different gun is not

necessarily relevant to whether a defendant knowingly possessed a new firearm (*see People

v Singleton*, 139 AD3d 208, 213 [2016]).[3]

As for the dissent's suggestion that we proceed blithely here, consistent with our

duty to safeguard the rights of criminal defendants to a fair trial, we have reversed in

numerous cases when *Molineux* evidence was improperly admitted (*see e.g. People v

Vargas*, 88 NY2d 856 [1996] [reversing conviction for rape, sodomy, sexual abuse, and

attempted robbery on *Molineux* grounds]; *Hudy*, 73 NY2d 40 [reversing conviction for

multiple counts of sexual abuse and endangering child welfare on *Molineux* grounds]; *Ely*,

68 NY2d 520 [reversing murder conviction on *Molineux* grounds]; *People v Santarelli*, 49

NY2d 241 [1980] [same]; *Zackowitz*, 254 NY 192 [Cardozo, J.] [same]). If, as the dissent

suggests, the People are regularly relying on *Molineux* evidence of prior gun possession to

prove current knowing possession of different guns—which the dearth of caselaw on the

topic suggests is not the case—we have no doubt that the People will be able to conform

---

[3] The dissent attempts to distinguish *Singleton* by pointing out that the defendants there claimed the gun giving rise to the criminal possession charge belonged to a third party (dissenting op at 6 n 3). The Appellate Division concluded that it was error to admit a photo of defendants holding a different gun because "the gun depicted [in the photo] was not the same gun, or even the same type of gun, as that recovered [at the scene]" (*Singleton*, 139 AD3d at 213). The same is true here.

their tactics to our holding today in order to avoid reversal of firearm possession convictions on appeal.

Moving on to the final step in our analysis, we hold that the trial court's ruling was not harmless. There was circumstantial evidence from which the jury could have inferred that Telfair knowingly possessed the guns in this case, but not overwhelming proof of guilt, and we cannot conclude there was no significant probability the jury would have acquitted Telfair had the evidence of the 2006 and 2007 incidents been excluded. While the People argue that the split verdict means that any *Molineux* error must have been harmless, there is no reason to reach that conclusion, rather than its inverse.

The prosecution's comments in summation compounded the impact of admitting the evidence of the prior incidents and make it even more difficult to conclude the error was harmless. Given that the propriety of these comments largely rises or falls with the *Molineux* ruling, they did not amount to prosecutorial misconduct.

Telfair separately contends the trial court committed reversible error in permitting testimony by both his wife, Samantha Telfair, and then-girlfriend, Caterina Scotto, as to other "uncharged crimes" allegedly committed against them. We hold that it did not. As to the testimony of Telfair's wife, the court provided adequate limiting instructions (to which the defendant did not object). As to Scotto's testimony, the defendant himself first raised these allegations during opening statements and during Scotto's cross-examination, and the People only elicited her testimony on redirect. And in any event, the testimony was harmless because it did not speak to the critical issue of whether Telfair knowingly possessed the firearms.

Because we conclude that Supreme Court erred in admitting *Molineux* evidence regarding the 2006 and 2007 incidents and that the error cannot be deemed harmless, we reverse.

Accordingly, the order of the Appellate Division should be reversed and a new trial ordered.

RIVERA, J. (concurring):

I agree for the reasons discussed by the majority that defendant Sebastian Telfair's claims under *People v Molineux* (168 NY 264 [1901]) have merit and warrant reversal of his conviction and a new trial ordered on the second-degree weapons possession counts. As for defendant's other claims, I would resolve them on different grounds.

First, contrary to the majority's conclusion, defendant's facial constitutional challenge to New York State's gun licensing regime, based on the United States Supreme Court's holding in *New York State Rifle & Pistol Assn., Inc. v Bruen* (142 S Ct 2111, 2125 [2022]), is preserved. However, the claim is without merit for the reasons discussed in my

- 1 -

dissent in *People v Garcia*, decided today. Defendant's alternative argument that his conviction violates the Privileges and Immunities Clause because, according to defendant, New York imposes an in-state residency requirement for obtaining a gun license also fails. Whether New York prohibits nonresidents from obtaining a gun license is an open question (*Osterweil v Bartlett*, 21 NY3d 580, 582 [2013] [finding that a part-time resident could obtain New York license regardless of their domicile]). Defendant's out-of-state residency is disputed, and because he did not apply for a license, we do not know whether he would have been denied a license because of a nonresidency prohibition or because he was a New York resident. As I discuss in *Garcia*, remittal is not appropriate in this context because it would turn his criminal proceeding into a quasi-administrative licensing hearing.

CANNATARO, J. (dissenting):

In 2017, defendant was pulled over after police observed him commit a traffic infraction in Brooklyn. The incident occurred within days of his relocation to New York from Florida. After defendant's arrest, an inventory search of the pickup truck he was

- 1 -

driving yielded a number of personal belongings, as well as three semi-automatic pistols, one semi-automatic assault weapon, several boxes of ammunition, and a bulletproof vest. Each of the firearms was loaded, operable, and belonged to defendant. None was licensed in New York. Defendant was charged with four counts of criminal possession of a weapon in the second degree (Penal Law § 265.03 [3]). His defense at trial was that someone else had packed the truck in Florida and he had no idea the firearms were inside. To rebut that claim, the People were permitted to present evidence showing that on two prior occasions when defendant was traveling into the northeast, an unlicensed firearm was found among defendant's belongings or in his vehicle and that he similarly claimed in those incidents his possession of the gun was an accident or innocent mistake.

The majority concludes that admission of this evidence was error under *People v Molineux* (168 NY 264 [1901]) because it had no relevance to the People's case. I believe the majority has fundamentally misconstrued our prior case law and infringed upon the discretion of the trial court. Indeed, it is difficult to avoid the conclusion that today's decision severely curtails a venerated evidentiary rule that has been in use since 1901. And it does so in the context of a gun-possession case, at a time when unlawful possession of firearms in this State is more persistent and threatening than ever. I therefore respectfully dissent.

I.

The *Molineux* rule states that when evidence of a defendant's uncharged crimes or prior misconduct "proves *only* criminal propensity and serves no *other* function in demonstrating defendant's guilt of the crime charged, there is no legitimate basis for its

admission" (*People v Cass*, 18 NY3d 553, 559 [2012] [emphases added, internal quotation marks omitted]). Conversely, it is well settled that "where the proffered *Molineux* evidence is relevant to some material fact in the case, other than the defendant's propensity to commit the crime charged, it is not to be excluded merely because it shows that the defendant had committed other crimes" (*id.* at 560; *see People v Ventimiglia*, 52 NY2d 350, 359 [1981] [The *Molineux* rule's "policy of protection against potential prejudice gives way when evidence of prior crime is probative of the crime now charged"]). In the latter event, the decision of whether to admit the evidence rests upon the trial court's discretionary balancing of probative value and unfair prejudice (*People v Bailey*, 32 NY3d 70, 83 [2018]). *Molineux* thus requires courts to engage in a "two-part inquiry" (*Cass*, 18 NY3d at 560).

In concluding that it was error to inform the jury of the two prior incidents in which defendant was caught carrying unlicensed firearms in public and claimed it was an innocent mistake, the majority remarkably opines that such evidence was irrelevant to any material issue in this case. I cannot agree. As the majority acknowledges, *Molineux* itself explicitly states that prior bad acts are relevant to prove "absence of mistake or accident" (168 NY at 293; majority op at 7). In the 122 years since *Molineux* was decided, this Court has reiterated that proving absence of mistake is a permissible *Molineux* purpose in dozens of opinions (*see e.g.*, *People v Denson*, 26 NY3d 179, 185 [2015]; *Cass*, 18 NY3d at 560; *People v Gamble*, 18 NY3d 386, 397 [2012]; *People v Alvino*, 71 NY2d 233, 244 [1987]; *In re Estate of Brandon*, 55 NY2d 206, 211 [1982]; *Ventimiglia*, 52 NY2d at 359; *People v Allweiss*, 48 NY2d 40, 47 [1979]; *People v Condon*, 26 NY2d 139, 143 [1970]).

Recognizing this long and unbroken line of authority, defendant's trial counsel did what many attorneys often do in service of their clients: he attempted to distinguish it. "We are not saying this is a *mistake*," he argued, "[w]e are saying he didn't *know* the guns were in the car" (emphases added). The courts below correctly recognized this as a distinction without a difference, both as a matter of semantics[1] and because proving that criminal acts were undertaken with the necessary "intent" or "guilty knowledge" (that is, scienter) is also a long-recognized basis for the admission of *Molineux* evidence (*Molineux*, 168 NY at 297). Here, the People were required to prove that defendant was "aware" of the presence of the firearms in his pickup truck as an element of their prima facie case (*People v Saunders*, 85 NY2d 339, 341-342 [1995])—i.e., that his acts were "knowing" (*People v Ford*, 66 NY2d 428, 440 [1985]). Defendant disputed that he had any knowledge of the guns in the truck on the night in question, relying on record evidence indicating that someone else may have packed the firearms in the vehicle in preparation for his relocation from Florida to New York. In other words, he suggested to the jury that his act of transporting multiple, unlicensed firearms through Brooklyn on the night in question was the result of an honest mistake, accident, or inadvertence (*see* Black's Law Dictionary [11th ed. 2019] [defining "honest mistake" as "(a) mistake made unintentionally" and an "accident" as "an unintended and unforeseen injurious occurrence"]). As a consequence, evidence of defendant's similar prior bad acts became relevant to prove not one but two

---

[1] As discussed further herein, defendant's lack of knowledge purportedly resulted from mistake, accident, or inadvertence.

issues under *Molineux* and its progeny: (1) defendant's intent or guilty knowledge, and (2) the absence of mistake or accident (*see Cass*, 18 NY3d at 559).

The reason *Molineux* evidence is admissible to prove intent or guilty knowledge is because proof of scienter "is often unobtainable except by evidence of successive repetitions of the act" (*Molineux*, 168 NY at 297-298). In an illegal gun possession case like this one, "guilt cannot be predicated upon the mere commission of the act charged as a crime" (*see People v Katz*, 209 NY 311, 328 [1913])—the simple fact that defendant drove a pickup containing illegal guns in the center console and truck bed does not necessarily mean defendant acted with awareness of their presence. "In such a case the general rule gives way to the exception under which guilty knowledge of a defendant may be proved by evidence of his complicity in similar offenses under such circumstances as to support the inference that the act charged was not innocently or inadvertently committed" (*id.*; *see Alvino*, 71 NY2d at 249). The relevance of such evidence "is founded on the law of probabilities. The theory is that the more often the act constituting the crime has been done, the less the likelihood that it could have been done innocently, as if by chance" (*People v Ingram*, 71 NY2d 474, 479 [1988], citing 2 Wigmore, Evidence §§ 302, 312 [Chadbourn rev 1979]).

Insofar as defenses of mistake, accident, good faith, and inadvertence aim to negate intent or guilty knowledge, the same logic also supports the admission of *Molineux*

evidence to prove the absence of those very excuses.[2] "The recurrence of the act negatives the possibility of good faith or inadvertence" (*see id.*). Here, defendant's history of repeatedly transporting firearms outside the jurisdictions in which they were licensed, as well as the similarity of his excuses when caught, tend to refute his defense that he did not know the guns were in his pickup this time—*i.e.*, that this was merely another instance of accidental or inadvertent possession. As *Molineux* and a century of case law makes clear, juries are entitled to consider such evidence in evaluating whether an act was committed knowingly or by mistake.

In contrast, "propensity" evidence is evidence introduced *solely* to show a defendant's "bad character" or tendency to engage in criminal conduct (*People v Agina*, 18 NY3d 600, 603 [2012]). "[C]ourts limit the admission of *Molineux* evidence because of the danger that the jury might conclude that if the defendant did it once, he or she likely did it again" (*People v Frumusa*, 29 NY3d 364, 370 [2017]). In this case, however, there was no dispute that defendant engaged in the conduct necessary for liability to attach under Penal Law § 265.03 (3)—he admits that the unlicensed firearms belonged to him and were in the truck he drove on the night in question.[3] Thus, the jury was not asked to find that

---

[2] In making this point, I do not dispute that "intent" and "absence of mistake or accident" can present distinct issues (*see Molineux*, 168 NY at 293). Intent or other scienter is typically an element of the People's prima facie case. Mistake is typically a defense. Here, defendant's mistake defense presented some unique factual issues for the People to disprove and led them to seek introduction of the *Molineux* evidence. However, the fact that mistake-type defenses target scienter means that the logic underpinning both *Molineux* exceptions is often (albeit perhaps not always) the same.

[3] *People v Singleton*, on which the majority relies, is easily distinguished on this basis: the defense in that case was that the gun *belonged to a third party*. The fact that the defendants

because "defendant did it once, he . . . likely did it again" (*id.*). Instead, they were asked to evaluate his scienter and the specific excuse he offered for *this* concededly unlicensed possession of firearms in view of the number of times he has committed similar bad acts and offered similar excuses. That context was important for the jury to fairly assess his defense.

The majority nonetheless insists that the key question at trial was not mistake, but lack of knowledge, and that this "plain" difference somehow supports the complete irrelevance of the 2006 and 2007 incidents (*see* majority op at 8). But it offers little reasoning for this conclusion, and our precedent does not support the notion that the evidence was irrelevant to either issue.[4] Take *People v Ingram* (71 NY2d 474 [1988]) for instance. In that case, the defendant acted as the getaway driver for a gas station robbery but argued at trial that he lacked "*knowledge* that [his companion] was intending to commit a robbery" (*see id.* at 476 [emphasis added]). The Court held that evidence of the defendant's participation in another, *subsequent*, gas station robbery with the same companion "ha[d] obvious relevance as tending to refute defendant's claim of an innocent state of mind" under the law-of-probabilities rationale (*id.* at 480).

---

had previously been photographed holding a different "type of gun" did not tend to refute their defense that *this gun* belonged to the third party, and the defendants were also depicted making "highly prejudicial" gang signs (139 AD3d 208, 212-213 [1st Dept 2016]). Here, there was no dispute over ownership of the specific firearms in question.

[4] The majority's hypothetical that "one might know an item had been in the car but mistakenly think it had been removed" (majority op at 8) is unilluminating. In that situation *Molineux* evidence would still be relevant to prove both knowledge and absence of mistake; as here, the mistake would be the purported reason for lack of knowledge at the time of the offense.

Even then-Associate Judge Kaye, in a concurrence from which the majority appears to draw inspiration,[5] agreed that evidence of the subsequent robbery was relevant to prove the defendant's "intent" to commit the charged offense, "eliminate[] the element of innocent intent," and "negative accident or inadvertence," based on the common understanding that "[s]imilar results, quite simply, do not usually occur through abnormal causes" (*see id.* at 482 [Kaye, J., concurring] [internal quotation marks omitted]). As she put it, the *Molineux* evidence "tend[ed] to decrease the possibility that [the defendant's] presence with [the companion] on the earlier occasion was coincidental or otherwise innocent" (*id.* at 483).

The same logic applies here. The sole question at defendant's trial was whether he possessed admittedly illegal firearms in New York with the required scienter or whether it was an innocent mistake. Evidence of the 2006 and 2007 incidents tended to decrease the possibility that defendant's criminal acts in 2017 were coincidental, accidental, inadvertent, or otherwise innocent.

---

[5] Judge Kaye expounded upon a difference she perceived between *Molineux* evidence aimed to prove a defendant's "knowledge of a particular fact" and evidence admitted to prove "intent to commit the charged crime" (*Ingram*, 71 NY2d at 482 [Kaye, J., concurring]). She described the first category as encompassing cases in which a prior bad act helps establish that the defendant was "warn[ed]" about the stolen or otherwise illegal nature of property (*see id.*). Although this warning-based reasoning was not adopted by the majority in *Ingram* (or by this Court in any decision post-*Ingram*), today's majority cites it to suggest that *Molineux* evidence is only admissible to prove knowledge in limited circumstances (*see* majority op at 9). In doing so, the majority ignores that Judge Kaye classified the *Ingram* defendant's lack-of-knowledge defense as falling into the "intent" category, agreeing with the *Ingram* majority that the defendant's participation in a *subsequent* gas station robbery tended to establish scienter and refute his claims of inadvertence, even though the warning logic obviously did not apply (*see id.* at 482-483).

The other rationale offered by the majority for its relevance holding is that defendant's prior acts of illegal firearm possession "involved different guns, different sets of circumstances, different excuses, and occurred more than 10 years earlier" (majority op at 10). The problem with this ground is that the distinctions the majority highlights regarding the 2006 and 2007 incidents go to the probative weight of those incidents, not their relevance. It may be true that admissible *Molineux* evidence generally involves bad acts "proximate in time and quite similar to the alleged crime" (*id.*). Never before, however, has any court in this State held that a prior bad act is irrelevant to prove lack of knowledge or mistake as a matter of law simply because it occurred approximately 10 years before the instant offense and involved minimally distinguishable facts. And if ever there were a case to draw such an arbitrary line in the sand, this is not the one.

*Molineux* does not require that the circumstances of the prior offenses be identical, only "similar" (*see Alvino*, 71 NY2d at 241; *see also People v Caban*, 14 NY3d 369, 372 [2010] [prior negligent incident properly admitted where it had "some noticeable similarities" with the charged negligence]). As we have explained, in reliance on a leading treatise: " 'mere prior occurrence of an act *similar in its gross features* – i.e., the same doer, and the same sort of act, but not necessarily the same mode of acting nor the same sufferer, may suffice' " (*Matter of Brandon*, 55 NY2d 206, 213 [1982] [emphasis added], quoting 2 Wigmore, Evidence [Chadbourn rev ed], § 304, p 251). Here, the fact that defendant's prior incidents involved "different guns" is unremarkable, particularly because unlawfully possessed firearms are generally destroyed by law enforcement and thus rarely are the subject of repeat offenses (*see* Penal Law § 400.05 [1]). No one has claimed that the prior

guns had meaningfully different attributes than the guns involved here or that those attributes had anything to do with defendant's reasons for unlawfully possessing them. The majority does not explain why this distinction is critical.

Nor does the age of the prior incidents diminish their probative force in this case given that defendant apparently was domiciled for most of the intervening time in Florida where the guns were licensed. In the analogous *Sandoval* context, our courts have long held that " 'there is no bright-line rule of exclusion based upon age of conviction' " (*People v McCommons*, 143 AD3d 1150, 1152 [3d Dept 2016] [2003 crimes "were not too remote in time to be of probative value" notwithstanding six-year period between those events and the charged crimes, particularly because the defendant was incarcerated during some of the intervening period], quoting *People v Martin*, 136 AD3d 1218 [3d Dept 2016] [involving two remote prior convictions], *lv denied* 28 NY3d 972 [2016]; *People v Portis*, 129 AD3d 1300, 1303 [3d Dept 2015] [similar], *lv denied* 26 NY3d 1091 [2016]; *People v Crooks*, 118 AD3d 816, 817 [2d Dept 2014] ["the oldest conviction occurred 10 years before the instant offenses"], *lv denied* 24 NY3d 1043 [2014]; *People v Wilson*, 78 AD3d 1213, 1215-1216 [3d Dept 2010] [prior conviction "occurred more than 10 years earlier"], *lv denied* 16 NY3d 747 [2011]). There is no reason the same rule should not apply in the *Molineux* context, particularly in gun-possession cases, which implicate serious issues of public safety and in which it is often easy for a defendant to claim mistake or inadvertence (*cf. People v Huertas*, 186 AD3d 731, 733 [2d Dept 2020] [*Molineux* evidence consisted of three prior gun-related incidents, each of which occurred over 10 years before the subject

shooting, offered to rebut the defendant's claim that shooting was an accident], *affd* 38 NY3d 1129 [2022]).

*People v Bradley*, on which the majority relies, does not support the novel rule it creates today. The majority seizes on this Court's statement that the defendant's claim of self-defense "was not in any direct or logical way disproved by proof of the bare circumstance that defendant at some remote, indeterminate time had stabbed an unidentified man in the thigh" (20 NY3d 128, 134 [2012]). However, the immediately following sentences from *Bradley* make clear that the remoteness of the prior incident was not the reason the Court saw no direct or logical link between the prior incident and the defense:

> "[w]hile that stabbing assertedly was in response to harassment, the nature of the harassment was left entirely to the imagination. It is possible that the harassment was relatively minor, but it is at least equally possible that it was not. If defendant during the earlier incident used her knife to ward off a sexual or other serious assault, it would not logically show that her subsequent conduct was, as the prosecution contended, simply an expression of unbridled rage" (*id.* at 134-135).

The majority ignores this express reasoning in favor of the more convenient soundbite that the prior incident occurred "at some remote, indeterminate time," a fact which although remarked upon was not the basis for our decision.

It is the job of the trial judge, who is closest to the evidence, to determine at what point the dissimilarity or remoteness of a prior bad act makes its admission insufficiently

probative to justify its risk of prejudice.[6]  The role of this Court is to assess whether the

balance struck by the trial judge under the particular facts and circumstances was an abuse

of discretion, not to impose our own contrary judgment on appeal (*see People v Morris*, 21

NY3d 588, 597 [2013]).  And although the majority denies any intent to set a "'bright-line

rule of exclusion' based on the age of the prior incidents" (majority op at 11 n 2), it cannot

have it both ways: if there is no bright-line legal rule, then the question necessarily

implicates the trial court's discretion.

For all of the claimed factual dissimilarities, the critical fact remains that defendant

was found to have transported unlicensed firearms into New York on two prior occasions,

and more than that, each time blamed some outside agency (frequently his girlfriend) for

their presence.  A jury could legitimately infer that the lesson defendant learned from the

prior incidents was that claiming mistake is helpful to avoid criminal liability in gun-

possession cases,[7] and that he employed that strategy in this instance.  This is certainly not

a case in which the *Molineux* evidence involved a completely unrelated crime or a

significantly different excuse.  The majority picks at trivial details to justify depriving the

jury of what is perhaps the best evidence that defendant knowingly transported a veritable

---

[6] *See People v Burkett*, 101 AD3d 1468, 1471 (3d Dept 2012) (listing "the temporal proximity of the events" as one of several factors appropriately considered "to achieve an appropriate balance" between probative and prejudicial value).  The lower court authorities cited by the majority are inapposite; they remarked on the similarity and proximity of the prior incidents solely to support their conclusions that "the probative value of the [*Molineux* evidence] outweighed its prejudicial effect" (*People v Lawrence*, 141 AD3d 1079, 1080-1081 [4th Dept 2016]; *People v Kidd*, 112 AD3d 994, 996 [3d Dept 2013]).
[7] In the first incident, defendant avoided criminal charges.  In the second, he was permitted to plead guilty to a lesser offense.

arsenal of weapons into this State. Under the law-of-probabilities rationale discussed in *Ingram*, I would hold that defendant's prior unlawful gun possessions easily satisfied *Molineux*'s relevance standard.

## II.

The question conveniently avoided by the majority's relevance holding is whether the trial court abused its discretion in balancing the probative value of the 2006 and 2007 incidents against their potential prejudicial impact. That is a difficult showing for a defendant to make on any appeal. Indeed, "when evidence of uncharged crimes is relevant to some issue other than the defendant's criminal disposition, it is generally held to be admissible on the theory that the probative value will outweigh the potential prejudice to the accused" (*People v Valentin*, 29 NY3d 150, 155 [2017] [internal quotation marks and brackets omitted]).

As we have further explained, evidence is not "prejudicial" merely because it is "compelling" and makes a conviction more likely: "[r]ather, the court must weigh the probative value of the evidence against the danger of *unfair or undue* prejudice to the defendant" (*Frumusa*, 29 NY3d at 372 [emphasis added, internal quotation marks omitted]). The danger of undue prejudice refers to the risk that the jury will convict based on the jurors' perception of the defendant's generally depraved character (*see Molineux*, 168 NY at 293; *see also Robinson*, 68 NY2d at 549-550 ["Prejudice involves both the nature of the crime, for the more heinous the uncharged crime, the more likely that jurors will be swayed by it, and the difficulty faced by the defendant in seeking to rebut the inference which the uncharged crime evidence brings into play"]).

In his briefs to this Court, defendant adopts the dissenting Justice's reasoning below that the evidence was prejudicial because the gun in the 2006 incident was placed "in a pillow that was imprinted with his baby's photograph" and the 2007 incident involved defendant "operating a vehicle at an excessive rate of speed without a valid driver['s] license" (198 AD3d 678, 689 [Barros, J., dissenting]). Neither of those points demonstrate that the evidence was so prejudicial that its admission amounted to an abuse of discretion. Defendants' prior crimes were not particularly "heinous" (*see Robinson*, 68 NY2d at 549-550; *compare Molineux*, 168 NY264 [evidence admitted that the defendant had previously killed a man by poisoning him with mercury]). It is difficult to grasp the prejudice caused by the child's photograph on the defendant's pillow: it was not the child's pillow, and the child was not present. The acts of speeding and driving with an expired license are not the type of conduct an average person is likely to feel compelled to punish regardless of the merits of the actual offense charged. Moreover, it is unclear whether defendant made specific and timely objections to these portions of the testimony. And to the extent the remoteness of the incidents and the fact that they involved different guns and necessarily different excuses on defendant's part diminished their probative value, they also diminished the risk of prejudice as the average juror is capable of recognizing and accounting for those differences (and as discussed below, the jurors here apparently did so).

Most importantly, the trial court expended substantial effort to ensure that defendant was not unfairly prejudiced by the introduction of the challenged evidence. The court repeatedly instructed the jury on the limited purpose for which they could consider that

evidence. It did so each time the People elicited evidence regarding defendant's prior bad acts, as well as during the prosecutor's opening and closing statements, during the court's final charge, and in response to a jury note. The jury was given a limiting instruction regarding the challenged evidence a total of ten times.

"Jurors are presumed to have followed a trial judge's limiting instructions" (*Morris*, 21 NY3d at 598).[8] That presumption is particularly appropriate here considering that the jury "rendered a 'discerning and discrete verdict' " by acquitting him of most of the criminal weapons possession charges (*see id.*, quoting *People v Till*, 87 NY2d 835, 837 [1995]). The verdict also refutes defendant's argument that the note jurors sent during deliberations, asking for clarification of the *Molineux* rule, demonstrates actual prejudicial impact. If anything, comparing the note and the ultimate verdict indicates that the jurors applied the *Molineux* rule carefully and properly, and that requiring the jury to deliberate under the assumption that this was the first time defendant illegally transported weapons in this State was not necessary to "safeguard the rights of … defendant[] to a fair trial" (majority op at 12).

---

[8] This Court has affirmed the admission of *Molineux* evidence based on trial courts' limiting instructions in many prior cases (*see e.g.*, *People v Tosca*, 98 NY2d 660, 661 [2002] [any prejudice was ameliorated by "the trial court twice instruct(ing) the jury on the limited use it could make of the testimony and that the testimony was not to be considered proof of the uncharged crime"]; *Morris*, 21 NY3d at 598 ["Any potential for prejudice here was offset by the trial court's four strong limiting instructions"]; *People v Till*, 87 NY2d 835, 837 [1995] ["The Appellate Division majority's analysis falls short also because it disregards the trial court's explicit emphasis twice, by cautionary instructions to the jury that the uncharged robbery testimony was provided to it solely 'for the purpose of background information' and 'for the continuity of the events' and was not to be considered as proof of the crimes at issue"]).

Ultimately, "[d]etermining whether the probity of [*Molineux*] evidence exceeds the prejudice to the defendant 'is a delicate business, and as in almost every case . . . there is the risk that uncharged crime testimony may improperly divert the jury from the case at hand or introduce more prejudice than evidentiary value" (*Morris*, 21 NY3d at 596-597 [internal quotation marks omitted]). "Yet this case-specific, discretionary exercise remains within the sound province of the trial court . . . which is in the best position to evaluate the evidence" (*id.* at 597). On this record, I am unable to conclude that the trial court abused its discretion in admitting the *Molineux* evidence, and I am unwilling to join the majority in circumventing that determination through a strained holding on relevance.

III.

Today's majority decision destabilizes our century-old *Molineux* jurisprudence. It does so in an illegal firearm possession case at a time when gun crime by repeat offenders is a particular problem for this State and may become even worse in the wake of the U.S. Supreme Court's recent decision in *New York State Rifle & Pistol Assn., Inc. v Bruen* (142 S Ct 2111 [2022]). Because the majority's reasoning is irreconcilable with our precedent, fails to identify any abuse of discretion, and may serve to undermine public safety, I would affirm.

Order reversed and a new trial ordered. Opinion by Judge Halligan. Chief Judge Wilson and Judge Troutman concur. Judge Rivera concurs in result in an opinion. Judge Cannataro dissents and votes to affirm in an opinion, in which Judges Garcia and Singas concur.

Decided November 21, 2023